679 So.2d 720 (1996)
James Bernard CAMPBELL, Appellant,
v.
STATE of Florida, Appellee.
No. 83792.
Supreme Court of Florida.
June 27, 1996.
Rehearing Denied September 6, 1996.
*722 Geoffrey C. Fleck, Gainesville, for Appellant.
Robert A. Butterworth, Attorney General and Fariba N. Komeily, Assistant Attorney General, Miami, for Appellee.
PER CURIAM.
We have on appeal the sentence of the trial court imposing the death penalty upon James Bernard Campbell following resentencing. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We reverse due to improper conduct by the prosecutor.
The facts are set out fully in Campbell v. State, 571 So.2d 415 (Fla.1990). Campbell rang the doorbell to the Bosler home at 2:15 p.m. on December 22, 1986, and when Billy Bosler answered the door, Campbell stabbed him a number of times. Billy's adult daughter, Sue Zann Bosler, heard the commotion and came to her father's aid, and Campbell stabbed her. Billy died, Sue Zann lived.
Campbell gave oral and written confessions, was charged with and convicted of first-degree murder, and was sentenced to death in conformity with the jury's nine-to-three vote. The court found five aggravating circumstances[1] and one nonstatutory mitigating circumstance.[2] This Court struck one aggravating circumstance[3] and held that two others should have been combined.[4] We ruled that the court should have considered in mitigation the fact that Campbell suffered from impaired capacity and had a deprived and abusive childhood. We remanded for resentencing before the judge.
Because the original trial judge was unavailable on remand, Campbell was given a whole new sentencing proceeding before a different judge and jury. The State presented four witnesses: A technician related details of the crime scene; a detective told of Campbell's confession; the medical examiner described the victim's wounds; and Sue Zann gave an account of the crime. Campbell presented several witnesses: Psychologist Dr. Frumkin testified concerning Campbell's *723 abusive childhood and present emotional problems; the prior testimony of two of Campbell's aunts was read to the jury; and psychologist Dr. Toomer testified relative to Campbell's emotional problems.
After the jury recommended death by a vote of ten to two, the court heard testimony from Sue Zann who stated that both she and her father did not believe in the death penalty. The victim's mother testified, requesting imposition of the death penalty. The court imposed the death penalty, finding three aggravating circumstances,[5] one statutory mitigating circumstance,[6] and one nonstatutory mitigating circumstance.[7] Campbell raises five issues and a number of subissues.[8]
Campbell claims that the prosecutor engaged in misconduct in several ways. First, he asserts that the prosecutor improperly discredited the defense psychologist, Dr. Toomer, on cross-examination by saying that he frequently testified for killers of police officers. We agree. Not only did the prosecutor ask Dr. Toomer if he testified frequently for the defense in such cases, he quizzed him at length about the death of specific officers in the Dade County area:
Q. In terms of some of the cases you have handled at penalty proceedings, you have testified at least three times for and found mitigation for three individuals who have killed police officers.
MR. HOULIHAN: Objection. Can we have a sidebar?
....
THE COURT: I disagree with you. The objection is overruled.
....
Q. You have testified for at least three individuals who killed police officers at sentencing hearings; is that correct?
MR. LIPINSKI: Same objection, Judge.
THE COURT: Overruled.
A. I am unsure as to the number, but I have testified in those type of proceedings, yes.
Q. You have testified on behalf of Manny Valle who killed a Coral Gables police officer?

MR. LIPINSKI: Can we have a standing objection?
THE COURT: The objection is overruled. There will be a continuing objection to this line of questioning.
Q. You have testified on behalf of Manny Valle and you found mitigation?
A. Yes.
Q. You have testified on behalf of a Mr. Patton who killed a City of Miami police officer?

A. That's correct.
Q. And you found mitigation? You have testified on behalf of Charlie Street who killed two Metro [Dade County] police officers and you found mitigation?
A. No, I did not.
Q. You weren't called in that case, were you?
A. No, I was.

*724 Q. You were listed as a witness in that case?
A. I may have been, but I did not testify in that matter.
Q. All right. And finally you're preparing to testify for Leonardo Fronki and you have testified.
MR. LIPINSKI: We're going to object to something he is preparing to do and hasn't yet done in this particular case.
THE COURT: Objection overruled.
MR. LIPINSKI: Assumes facts not in evidence.
THE COURT: Okay. The objection is overruled.
Q. You have recently testified on behalf of Leonardo Fronki on a first-degree murder at the penalty proceeding?
A. Yes.
Q. You found mitigation?
A. Yes, I did.
Q. And Mr. Fronki is facing yet another first-degree murder for the murder of Officer Baur, a North Miami Police Officer; is that correct?
A. I believe that's correct.
Q. But you haven't testified in that case yet, have you?
A. No, I am not scheduled to testify to my knowledge in that case.
Q. And that case won't be tried until May?
A. I don't know.
(Emphasis added.)
The prosecutor then emphasized this matter by commenting to the jury at closing:
Dr. Toomer testified that in at least ten times or maybe more he has testified to mitigating factors solely for the defense in the case of individuals who have murdered police officers he's found ... mitigation.
We have held that in a capital case the State may point out the frequency with which a defense expert testifies for capital defendants, since this is "relevant to show bias, prejudice, or interest." Henry v. State, 574 So.2d 66, 71 (Fla.1991). But the fact that an expert has testified for defendants in cases involving the murder of a police officer is prejudicial and irrelevant in a case, such as the present, where no officer was killed. This line of questioning both denigrated the testimony of Dr. Toomer and raised the specter of "cop-killers" where none was actually present. Further, Campbell's resentencing took place in Miami and each of the four cases mentioned by the prosecutor involved the death of one or more officers in Dade County. The prosecutor thus unfairly exploited the jurors' natural sense of sympathy and outrage for the fallen officers and fear for their own safety.
Campbell next complains that the prosecutor made the following comment to the jury in closing:
The question you have to answer is does the mitigation change the circumstances of Billy Bosler's murder. The death penalty is a message sent to a number of members of our society who choose not to follow the law.
Responding to a defense objection, the court addressed the prosecutor at sidebar: "Court will overrule the objection. Please don't talk about messages to other people." The prosecutor said, "Other than the defendant," and then addressed the jury:
The death penalty is a message sent to certain members of our society who choose not to follow the rules.
It's only for one crime, the crime of first degree murder. It is for those who choose to violate the sacredness and sanctity of human life.
"Message to the community" arguments are impermissiblethey are "an obvious appeal to the emotions and fears of the jurors." Bertolotti v. State, 476 So.2d 130, 133 (Fla. 1985). "These considerations are outside the scope of the jury's deliberation and their injection violates the prosecutor's duty to seek justice...." Id.
We conclude that the above errors combined to deny Campbell a fair penalty hearing. The "cop-killer" rhetoric and "message to the community" statements played to the jurors' most elemental fears, dragging into the trial the specter of police murders and a lawless community that could imperil *725 the jurors and their families. These arguments, which were emphasized at closing, were fresh in the jurors' minds when they retired to consider Campbell's sentence, and the State has failed "to prove beyond a reasonable doubt that the error[s] ... did not contribute to the [recommended sentence]." State v. DiGuilio, 491 So.2d 1129, 1138 (Fla. 1986). On this record, it is entirely possible that several jurors voted for death not out of a reasoned sense of justice but out of a panicked sense of self-preservation.
We repeat our admonition in Bertolotti v. State, 476 So.2d 130 (Fla.1985):
Nonetheless, we are deeply disturbed as a Court by continuing violations of prosecutorial duty, propriety and restraint. We have recently addressed incidents of prosecutorial misconduct in several death penalty cases. As a Court, we are constitutionally charged not only with appellate review but also "to regulate ... the discipline of persons admitted" to the practice of law. This Court considers this sort of prosecutorial misconduct ... to be grounds for appropriate disciplinary proceedings. It ill becomes those who represent the state in the application of its lawful penalties to themselves ignore the precepts of their profession and their office.
Id. at 133 (citation omitted). See also Garcia v. State, 622 So.2d 1325 (Fla.1993); Nowitzke v. State, 572 So.2d 1346 (Fla.1990).
Although the above errors require reversal of Campbell's death sentence, we address several additional claims to aid in resentencing. Campbell claims that the prosecutor unnecessarily introduced testimony and photographs depicting Campbell's attack on Sue Zann. We find the testimony and photographs relevant to explain the sequence of events surrounding the murder of Billy Bosler and to provide details showing that Campbell had been convicted of a prior violent felony. See, e.g., Dufour v. State, 495 So.2d 154 (Fla.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1332, 94 L.Ed.2d 183 (1987). The court instructed the jury:
Although the evidence that you have heard in this trial included testimony of Suzanne Bosler and about Suzanne Bosler, I instruct you that sympathy for Suzanne Bosler is not a legal aggravating circumstance.
You're prohibited from giving this matter any weight toward the decision to recommend a death sentence.
We find no error.
After Sue Zann testified for the State giving details of the crime, defense counsel sought to bring out on cross-examination that she is opposed to the death penalty. Campbell claims that the court erred in preventing this line of questioning. This issue has already been decided adversely to Campbell. See, e.g., Jackson v. State, 498 So.2d 406 (Fla.1986), cert. denied, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987).
Campbell argues that the court should have allowed Sue Zann to testify that Billy was opposed to the death penalty. We disagree. The victim's opposition to the death penalty is unrelated to the defendant's culpabilityit has nothing to do with the defendant's character or record or the circumstances of the crimeand thus is irrelevant to sentencing. See Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). We find no error.
At the time of resentencing, Campbell had already been sentenced to consecutive life terms for other related crimes and now claims that the court erred in preventing him from pointing this out to prospective jurors and in declining to instruct the jury on this. This issue has already been decided adversely to Campbell. See, e.g., Nixon v. State, 572 So.2d 1336 (Fla.1990), cert. denied, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991). We find no error.
Campbell claims that the court erred in failing to give the requested instruction on age as a mitigating circumstance. We agree that the court erred under the facts of this case. Florida's capital sentencing scheme expressly establishes age as a mitigating circumstance:
(6) MITIGATING CIRCUMSTANCES. Mitigating circumstances shall be the following:
....

*726 (g) The age of the defendant at the time of the crime.
§ 921.141, Fla. Stat. (1985).
There is no bright-line rule for applying this provision at any particular age. Rather, circumstances in addition to chronological age are often determinative:
There is no per se rule which pinpoints a particular age as an automatic factor in mitigation. The propriety of a finding with respect to this circumstance depends upon the evidence adduced at trial and at the sentencing hearing.
Peek v. State, 395 So.2d 492, 498 (Fla.1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981).
Chronological age standing alone thus is generally of little import, warranting no special instruction. See Echols v. State, 484 So.2d 568, 575 (Fla.1985), cert. denied, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 166 (1986) ("[I]f [age] is to be accorded any significant weight, it must be linked with some other characteristic of the defendant or the crime such as immaturity or senility."). However, where the defendant has requested an instruction on age and submitted reliable evidence tending to link his or her chronological age to "some other [relevant] characteristic of the defendant or the crime," an appropriate instruction should be given. See Stewart v. State, 558 So.2d 416, 420 (Fla. 1990) ("[A]n instruction is required on all mitigating circumstances `for which evidence has been presented' and a request is made.").
In the present case, evidence was presented showing Campbell's relatively young chronological age at the time of the crime (he was twenty-one) and linking this to the defendant's significant emotional immaturity: Dr. Toomer testified, "I would place [Campbell's] age, his emotional age in terms of functioning at being somewhere in the adolescent range." In light of this evidence, the court should have given the requested instruction.
Campbell claims that the court erred in finding that the murder was committed in a heinous, atrocious, or cruel manner. We disagree. The record shows that Billy was stabbed twenty-three times over the course of several minutes and had defensive wounds. See, e.g., Hansbrough v. State, 509 So.2d 1081 (Fla.1987). We find no error.
We reverse Campbell's death sentence due to improper conduct by the prosecutor and remand for resentencing before a new judge and jury.[9]
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, HARDING and ANSTEAD, JJ., concur.
GRIMES, J., dissents with an opinion.
WELLS, J., dissents with an opinion.
GRIMES, Justice, dissenting.
While I agree that the objections to the prosecutor's arguments referred to in the majority opinion should have been sustained, I am convinced beyond a reasonable doubt that these errors were harmless.
WELLS, Justice, dissenting.
I dissent.
First, my reading of the record in this case causes me to conclude that the cross-examination questions in respect to the defense expert's other cases did not have the inflammatory effect which the majority ascribes to the questions. Moreover, I believe that it is not a proper basis upon which to reverse a trial judge for this Court to speculate that these questions together with the very isolated comments of the prosecutor caused any jurors to make a decision in this case "out of a panicked sense of self-preservation." At the end of the two long trials in which twenty-four jurors have weighed the aggravating and mitigating circumstances in respect to the death sentence, nineteen jurors have recommended death. I find no basis upon which to conclude that any of these jurors made their decisions other than on the basis of the overwhelming evidence which supports the death sentence in this case.
Second, it is my view that if there was any error in the overruling of the objections upon which the majority bases its decision, the *727 error was harmless beyond a reasonable doubt.
I do not comprehend how the majority can, on the basis of the limited testimony and statements to which the majority opinion refers, again remand this case for a new trial when the testimony of the victim's daughter, Sue Zann, is considered. This courageous 31-year-old woman identified appellant as being her father's murderer, and testified in detail as to witnessing her father's murder and being stabbed herself repeatedly by appellant. A part of Sue Zann's testimony about the murder began with her describing what happened when she came out of her bedroom at the parsonage, which was the home of her father, mother, and sister:
Q. You're indicating that your dad was in the doorway, a man was stabbing him?
A. Yes.
....
Q. What, if anything, did you do?
A. By the time I got, I was walking out towards him to help him. He was being stabbed so many times that he was collapsing to the floor.
Q. And what did you do as you approached this scene?
A. As I approached the scene I went forward to help and I must have screamed because he turned around and he was going to stab me in the front.
Q. When you say he, SueZann, who are you talking about?
A. The man who was stabbing my father.
Q. You turned around and he goes to stab you in the front?
A. Yes.
Q. What do you do?
A. I turned to the right like this and he stabbed me three times in the back.
Q. Where on your back did he stab you?
A. Once in my shoulder, the knife went approximately four inches into my flesh, once below my shoulder in the back and three inches in and right by my spine approximately two inches.
Q. After you were struck those three times, what did you do?
A. I was knocked to the floor on my knees.
Q. Okay. Did he continue stabbing you?
A. No.
Q. What was your father doing?
A. He was trying to get up on his knee to try to help me.
Q. When you last saw him, he was on his knees in the hallway?
A. He was trying to get on his knees.
Q. So he was trying to lift himself up?
A. Yes.
Q. Was he able to do that?
A. No.
Q. Did he start to crawl toward you?
A. No, he couldn't.
Q. What did he do? This is right around here is it not, SueZann?
A. Yes.
Q. And you're stabbed over here?
A. Yes.
Q. Your father starts to move towards you or tries to get up?
A. He is trying to still get up.
Q. What happens to him next?
A. After I was stabbed to the floor, dad was trying to get up and the man turned around and start stabbing dad in the back many times.
Q. When he was crawling on the [floor]?
A. When he was trying to get up.
Q. And he was trying to get up in this area here?
A. Yes, yes.
Q. After he stabbed your dad again on the floor, what did you do, did you get up[?]
MR. HOULTHAN: Objection, it's not a proper statement what SueZann just said.
THE COURT: Jury will recall what the witness testified to.
Q. After you saw your father being stabbed for a second time, did you get up?

*728 A. Yes.
Q. What did you do?
A. I turned around as he was stabbing my father in the back and my father collapsed to the floor again. And as I was getting up trying to help my father again, the man turned around and he was looking at me and he led me with his hand on my shoulder backing me into the living room.
Q. That's up here?
A. Yes.
Q. He actually placed his hand on your shoulder?
A. Yes, he did.
Q. So you were within two feet?
A. Or closer, yes.
Q. You were able to look him in the eye?
A. Yes.
Q. Look him in the face?
A. We were staring, yes.
Q. What did he do?
A. He had the knife right up here, so looked like he was going to stab me in the face so I turned my head like this to the right hand the knife went in twice into my skull and shattered my skull and the tip of the knife went into two areas of my brain.
Q. You have a plastic plate in your head now, don't you?
A. Yes.
Q. After you were stabbed twice in the head, what did you do?
A. I was collapsed to the floor with my face on the right-hand-side front down. I mean the side was laying down.
Q. That's your right hand side?
A. That would have been in this area here, yes.
Q. Would have been looking in this direction towards the front door?
A. Yes.
Q. Were you able to see your father again over here?
A. Yes. The sofa you could see right underneath.
Q. This couch here you were able to look underneath the leg?
A. Yes.
Q. Did you see your father crawling along here?
A. I did when he was backing me into the living room with his hand on my shoulder out of the corner of my eye he was crawling towards the door.
Q. And when you went down here you were actually able to see your father underneath the couch?
A. Yes.
Q. Was he still making those noises?
A. Yes. Like he couldn't breathe.
Q. You're lying on the floor, you had been stabbed three times in the back, twice in the head, where is the defendant as you're on the floor?
A. When I fell down his presence was still there looking on at me like I knew he was watching me to see if I was dead. He wanted to make sure I was dead, so I held my breath to pretend I was dead.
Q. How long did he stand over you?
A. Seconds, twenty, thirty seconds approximately.
Q. After he left you, I am assuming did he eventually leave you?
A. Yes.
Q. Where did he go?
A. He first went into my room.
Q. Rear bedroom?
A. Correct.
Q. Do you know where he went next?
A. My sister, Linette's room.
Q. That's this one up here?
A. Yes.
Q. Do you know where he went after that?
A. He was walking on the floor behind me, I could hear him because it was a tarrasial (phonetic) floor.
Q. Okay.
A. He was walking back and forth.
Q. Did he ever go to your parent's room?
A. After that he did.
My conclusion is that the error upon which the majority bases its decision pales into harmlessness in the face of this testimony.
*729 Remanding this case for a third sentencing proceeding is not harmless. There is real harm in requiring Sue Zann Bosler to relive her father's murder a third time on the witness stand. There is real harm in this case not reaching the final judgment stage in the ten years since the murder.
NOTES
[1] The court found the following aggravating circumstances: prior conviction of a violent felony; commission during a burglary and robbery; commission for pecuniary gain; commission in a heinous, atrocious or cruel manner; and commission in a cold, calculated and premeditated manner.
[2] The court found that Sue Zann and members of Bosler's parish requested that Campbell be spared.
[3] The evidence failed to support the trial court's finding that the murder was committed in a cold, calculated, and premeditated manner.
[4] We noted that commission during a robbery and pecuniary gain should have been treated as a single aggravating circumstance.
[5] The court found the following aggravating circumstances: that Campbell had been convicted of a prior violent felony; that the murder was committed during a robbery and for pecuniary gain; and that the murder was heinous, atrocious, or cruel.
[6] The court found that Campbell suffered from impaired capacity.
[7] The court found that Campbell had a history of drug and alcohol abuse, an abusive childhood, a limited education, a low IQ, and learning disabilities.
[8] Campbell claims that the court erred in the following matters. 1) The prosecutor improperly: attacked the defense expert as sympathetic to cop-killers; advocated imposing the death penalty to send a message to the community; and introduced testimony and photos depicting Campbell's attack on Sue Zann; 2) Sue Zann should have been allowed to testify that she and her father were opposed to the death penalty; 3) defense should have been allowed to tell the venire that Campbell was already serving consecutive life sentences; 4) the court should have instructed the jury that Campbell was already serving consecutive life sentences; 5) the court should have given more weight to nonstatutory mitigators; the court should have given more weight to the statutory mitigator; the court should have found more mitigators as established; the court should not have found HAC; the death penalty is disproportionate; the death penalty is unconstitutional.
[9] We find the remainder of Campbell's claims to be moot or without merit.