778 So.2d 906 (2000)
Kevin Don FOSTER, Appellant,
v.
STATE of Florida, Appellee.
No. SC93372.
Supreme Court of Florida.
September 7, 2000.
Rehearing Denied January 22, 2001.
*909 James Marion Moorman, Public Defender, and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Kevin Don Foster. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. As explained below, we affirm Foster's conviction and sentence of death.

TRIAL
The evidence presented at trial established that in early April of 1996, a few teenagers organized a group called the "Lords of Chaos." The original membership of the group was made up of Foster, Peter Magnotti and Christopher Black, the latter two of whom were attending Riverdale High School ("Riverdale") at the time. Foster, the leader of the Lords of Chaos, was not a student. The group eventually grew to later include, among other Riverdale students, Derek Shields, Christopher Burnett, Thomas Torrone, Bradley Young and Russell Ballard as additional members. Each member of the Lords of Chaos had a secret code name. Foster's code name was "God." The avowed purpose of the group was to create disorder in the Fort Myers community through a host of criminal acts.
*910 On April 30, 1996, consistent with its purpose, the group decided to vandalize Riverdale and set its auditorium on fire. Foster, Black, and Torrone entered Riverdale and stole some staplers, canned goods, and a fire extinguisher to enable them to break the auditorium windows. Leading the group, Foster carried a gasoline can to start the fire in the auditorium while the other group members, Shields, Young, Burnett, Magnotti, and Ballard, kept watch outside.
The execution of the vandalism was interrupted at around 9:30 p.m., when, to the teenagers' surprise, Riverdale's band teacher, Mark Schwebes, drove up to the auditorium on his way from a school function nearby. Upon seeing the teacher, Foster ran, but Black and Torrone were confronted by Schwebes who seized the stolen items from them. Schwebes told them that he would contact Riverdale's campus police the next day and report the incident. Schwebes then left to have dinner with a friend, David Adkins.[1]
When Black and Torrone rejoined the others, Black declared that Schwebes "has got to die," to which Foster replied that it could be done and that if Black could not do it, he would do it himself. Foster was apparently concerned that the arrest of Black and Torrone would lead to the exposure of the group and their criminal activities.
Subsequently, Black suggested that they follow Schwebes and make the killing look like a robbery. However, upon further discussion, the group decided to go to Schwebes' home and kill him there instead. Foster then told the group that he would go home and get his gun. They obtained Schwebes' address and telephone number through a telephone information assistance operator, and confirmed this information by calling and identifying Schwebes' voice on his answering machine. They then went to Foster's home where they obtained a map to confirm the exact location of Schwebes' address, and procured gloves and ski masks in preparation for the killing. Foster decided to use his shotgun in the killing, and replaced the standard birdshot with # 1 buckshot, a more deadly ammunition. The group also retrieved a license tag they had stolen earlier to use during the crime.
Black, Shields, Magnotti, and Foster agreed to participate in the murder, and at 11:30 p.m., drove to Schwebes' home. Shields agreed to knock at the door and for Black to drive. When the group finally arrived there, Foster and Shields walked up to Schwebes' door, and as Shields knocked, Foster hid with the shotgun. As soon as Schwebes opened the door, Shields got out of the way, Foster stepped in front of Schwebes and shot him in the face. As Schwebes' body was convulsing on the ground, Foster shot him once more.
Although there were no other eyewitnesses, two of Schwebes' neighbors heard the shots and a car as it left the scene.[2] Paramedics arrived at the scene almost immediately and declared Schwebes dead. The medical examiner confirmed that Schwebes died of shotgun wounds to his head and pelvis, and that Schwebes would have died immediately from the shot to the face.
On the way to Foster's home after the killing, the group stopped to remove the stolen tag, and Foster wiped off the tag to remove any fingerprints before discarding it. Once home, the four of them got into a "group hug" as Foster congratulated them for successfully sticking to the plan. Foster then called Burnett and Torrone and boasted about how he blew off part of Schwebes' face and to watch for it in the *911 news. The next day, on May 1, 1996, while at Young's apartment, the six o'clock news reported the murder, and Foster continuously laughed, hollered, and bragged about it. Young testified that Foster said that he looked Schwebes right in the eyes before shooting him in the face and then watched as this "red cloud" flowed out of his face.
The police found Foster's shotgun, a ski mask, gloves, and a newspaper clipping of the murder in the trunk of Magnotti's car. According to Burnett, he was directed by Foster to put those items in Magnotti's trunk. Foster's fingerprint was found on the shotgun, the latex gloves, and the newspaper. Burnett and Magnotti's prints were also found on the newspaper.
Foster's mother, Ruby Foster ("Ms.Foster"), testified on direct examination that Foster called her from home at around 4:30 p.m. on the day of the murder. When she got home that night, at 9 p.m., Foster was there. She later left the house at about 9:45 p.m., but found Foster home when she returned a little past 11 p.m. She made another trip to the Circle K store and returned at about 11:20 p.m. once again to find Foster where she left him. On cross-examination, however, Ms. Foster admitted that she merely assumed that Foster was at home when he called her. Additionally, all the participants in the conspiracy and the murder testified that when they met at Foster's home on the night of the murder, no one was in the home and Foster had to disable the alarm apparatus upon entering.
All the members of the Lords of Chaos who participated in the murder and the conspiracy cooperated with the State through various plea agreements[3] and testified to the above facts at trial against Foster with regard to the make-up of the group, Foster's leadership role in the group, criminal acts committed by the group prior to the murder, and his leadership and mastermind role in the conspiracy and the ensuing murder. Foster was convicted for the murder of Schwebes.

PENALTY PHASE
During the penalty phase, the State presented one witness. The State's witness, Robert Duram, was the director of student assignment for Lee County and former principal of Riverdale. Duram testified to his knowledge and hiring of Schwebes as band director. He also testified that Schwebes' death was devastating not only to the school, but also to the rest of the student body, whose participation in extracurricular activities dropped significantly as a result of the tragedy. The school had to bring in numerous counselors to help the students cope with the effects of Schwebes' death.
The defense presented numerous witnesses who presented a picture of Foster as a kind and caring person. May Ann Robinson, Foster's neighbor, testified that he once helped her start her car and offered to let her borrow a lawn mower. Robert Moore, another neighbor, testified that Foster was well-mannered and a hard worker. Shirley Boyette found Foster to be very caring, intelligent, and well-mannered. Robert Fike, Foster's supervisor at a carpentry shop, and James Voorhees, his co-worker, found him to be a reliable worker. Voorhees also testified that Foster was very supportive to Voorhees' son who suffered from and eventually died of leukemia. Similarly, Raymond and Patricia Williams testified that Foster was very nice to their son who suffered from spina bifida. Peter Albert, who is confined to a *912 wheelchair, related how Foster had helped Albert's mother care for him after his wife died. Foster also helped Albert in numerous other ways, including preparing his meals, fixing things around the house, and helping Albert in and out of his swimming pool.
There was additional testimony that described Foster's involvement with foreign exchange students. Foster was also known to have given positive advice to young children. Foster's sister, Kelly Foster, testified to how he obtained his GED after dropping out of high school and that he obtained a certificate for the completion of an "auto cad" program at a vocational-technical school. Finally, Foster's mother testified that he was born prematurely and suffered from allergies, and that Foster's father abandoned him a month after birth. On cross-examination, many of the witnesses who testified to Foster's kindness admitted that they had not been in contact with him for a number of years.

SENTENCE
The jury recommended that Foster be sentenced to death by a nine-to-three vote. Following a Spencer hearing,[4] the trial court found two aggravating factors: (1) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;[5] and (2) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[6] Further, the court rejected the statutory mitigator of age-Foster was eighteen at the time of the crime-and attached very little to no weight to some twenty-three nonstatutory mitigators offered by Foster.[7] The trial court followed the jury's recommendation and imposed the death penalty. Foster now appeals and raises seven issues for review.[8]

Change of Venue
Initially, Foster asserts that, in light of extensive local pretrial publicity, the trial court erred in denying his several motions for change of venue. A criminal defendant is guaranteed a right to a fair trial by an impartial jury by both our state and federal constitutions. See Singer v. State, 109 So.2d 7, 15 (Fla.1959). We have accordingly provided the following test to determine when a change of venue is necessary to protect a defendant's right:
The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.
Rolling v. State, 695 So.2d 278, 284 (Fla. 1997) (quoting McCaskill v. State, 344 So.2d 1276, 1278 (Fla.1977)). Once a defendant raises the partiality of the venire, the trial court must make the following two-pronged analysis: "(1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury." Rolling, 695 So.2d at 285. *913 The burden of showing bias and prejudice is upon the defendant. See Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).
Of course, the mere existence of some pretrial publicity does not necessarily lead to an inference of partiality. See Farina v. State, 679 So.2d 1151, 1154 (Fla. 1996) (citing Bundy v. State, 471 So.2d 9, 19 (Fla.1985)). Rather, the pretrial publicity must be examined in the context of numerous circumstances, including: (1) when it occurred in relation to the time of the crime and the trial; (2) whether the publicity was made up of factual or inflammatory stories; (3) whether the publicity favored the prosecution's side of the story; (4) the size of the community; and (5) whether the defendant exhausted all of his peremptory challenges. See Rolling, 695 So.2d at 285.
Trial courts are also encouraged to attempt to impanel a jury before ruling on a change of venue. See Henyard v. State, 689 So.2d 239, 245 (Fla.1996); Davis v. State, 461 So.2d 67, 69 n. 1 (Fla.1984); Manning v. State, 378 So.2d 274, 276 (Fla. 1979). This provides trial courts an opportunity to determine through voir dire whether it is actually possible to find individuals who have not been seriously infected by the publicity. See Rolling, 695 So.2d at 285. If the trial court finds such individuals, a jury is selected. Where the voir dire fails to produce these individuals, the trial court must grant the motion for change of venue. See id.
While there was indeed a great deal of publicity about the case in the local community, applying the principles of law discussed above, we conclude the trial court properly denied Foster's motions for change of venue. We first focus on the nature and impact of the cited articles, and whether the articles were objective and factual in nature or whether they were inflammatory. See Rolling, 695 So.2d at 285 (citing Provenzano v. State, 497 So.2d 1177, 1182 (Fla.1986)).
Foster provided voluminous records of various newspaper articles and television news accounts of pretrial publicity. These included: (1) news stories immediately after Foster's arrest of how Foster and the Lords of Chaos had planned to go to Disney World and kill as many black tourists as possible; (2) an article on May 9, 1996, titled "Kevin Foster Head of Pack" with various references to Foster as a "psychopath," "Opie with a gun," and a "Jekylland-Hyde character;" (3) a column published on March 1, 1998, just two days before trial, titled, "Old Sparky's hot jolt may await Foster" with references to Foster as a "redneck, racist, gun-crazed punk." Another news article reported that a candidate for sheriff had made similar remarks about Foster.
In contrast to the above-cited articles, most of the articles relied upon were not inflammatory. Instead, they reported on the stages and activities of the prosecution and on plea agreements entered into by the other members of the Lords of Chaos. In fact, in one of the articles, Foster's defense counsel was quoted as saying that he had expected the plea agreements and had been preparing for them all along. Some articles focused on Schwebes' life and his contribution to the community. Still, others focused on students' reaction to and coping with the incident and on the state of various programs dealing with teenagers. Many others simply commented on and updated the proceedings in the case. We conclude that the media coverage as a whole did not reach such an inflammatory level to have irreversibly infected the community so as to preclude an attempt to secure an impartial jury.
In United States v. Lehder-Rivas, 955 F.2d 1510, 1524 (11th Cir.1992), for instance, the media referred to the defendant as a "drug kingpin, narcoterrorist" who was fascinated with the Third Reich. There, the court found that "such publicity, while unfavorable, did not reach the extreme levels required to trigger a finding of presumed prejudice." Id. Yet, the *914 media references in Lehder-Rivas cannot be said to have been less inflammatory than the ones in the instant case. Moreover, of the jurors eventually empaneled in this case, no one indicated any exposure to the more egregious references cited by Foster.
We must also consider the actual timing of the articles. Most were published some two years before the trial actually took place. In Rolling, as pointed out by Foster, we concluded that three and a half years was a significant time in which the tremendous publicity brought out initially by the case may have dissipated in its effect. See Rolling, 695 So.2d at 287. Similarly, whether the publicity in this case still affected the community after a two-year lapse between the time of the brunt of the media frenzy and the time of trial requires that we examine the voir dire, as provided for by the second prong of Rolling.
During voir dire, most of the veniremen stated that they had heard something about this case through the media. As in Rolling, however, the court eliminated all those who stated that their fixed opinion would prevent them from reviewing the evidence in a fair manner. Moreover, as in Rolling, the trial court carefully permitted individual voir dire in two phases, first about pretrial publicity, and second about the venire's positions on the death penalty. The jurors who were finally selected all stated without equivocation that they could be fair and set aside what they had heard. See Rolling, 695 So.2d at 287; Henyard, 689 So.2d at 246 ("While the jurors had all read or heard something about the case, each stated that he or she had not formed an opinion and would consider only the evidence presented during trial in making a decision."). Most importantly, however, not only did Foster not challenge for cause any of the jurors actually seated, he was also allotted additional peremptory challenges by the trial court in order to ensure that no biased jurors were selected.
Of course, trial courts should approach this issue conservatively and err on the side of excluding a potentially biased juror. In addition, there are instances in which a trial court must grant a change of venue motion despite assurances of impartiality from the jurors. Certain communities may be so small and the residents so close and personally connected to each other that a particular defendant could not get a fair trial in that community in a highly publicized case. However, Lee County, from which Foster's jury was selected, does not appear to be such a place. With a population of 405,637, Lee is the eleventh largest of the sixty-seven counties in this state. See Florida Statistical Abstract 10 (33d ed.1999). It should be noted that Rolling's sentencing proceedings, which involved the highly publicized murder of five University of Florida students, took place in the university town of Gainesville itself, in Alachua County. Alachua is about half the size of Lee, with a high concentration of students and residents in Gainesville itself. Nevertheless, the trial court successfully selected a jury there. At the end, a jury was also selected in just three days here, as opposed to the three weeks it took in Rolling.
We therefore conclude that, as in Rolling, the trial court did not abuse its discretion in denying the change of venue motions since the circumstances from the record do not indicate that the community was so infected by the media coverage of this case that an impartial jury could not be impaneled, and an impartial jury appears to have been actually seated.

Hearsay
In issue two, Foster contends that the trial court erred in admitting hearsay testimony of several witnesses.
As defined in section 90.801(1)(c), Florida Statutes (1997), "`[h]earsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A statement may, however, be offered to prove a *915 variety of things besides its truth. See Williams v. State, 338 So.2d 251 (Fla. 3d DCA 1976) ("Merely because a statement would not be admissible for one purpose (i.e., its truth or falsity) does not mean it is not admissible for another (e.g., to show the declarant's state of mind.")). A statement may be offered, for instance, to show motive, see Escobar v. State, 699 So.2d 988, 997 (Fla.1997); Chatman v. State, 687 So.2d 860, 862 (Fla. 1st DCA 1997); knowledge, see Colina v. State, 570 So.2d 929, 932 (Fla.1990); Duncan v. State, 616 So.2d 140, 141 (Fla. 1st DCA 1993); or identity, see State v. Freber, 366 So.2d 426, 427 (Fla.1978). Of course, the alternative purpose for which the statement is offered must relate to a material issue in the case and its probative value must not be substantially outweighed by its prejudicial effect. See State v. Baird, 572 So.2d 904, 907 (Fla.1990).
Foster argues that the statements of Magnotti, Young, and Shields, which repeated what Black had told them regarding Schwebes' statement to Black and Torrone about reporting them to campus authorities, constituted hearsay within hearsay and, therefore, were not admissible. We conclude that the trial court properly admitted these statements to establish both knowledge and motive, rather than to establish the factual truth of the contents of the statements. Specifically, these statements were introduced to show, first, that Foster and the rest of the group members present had knowledge of the statement made by Schwebes. As provided for in Colina, that is a perfectly permissible purpose for which an otherwise hearsay statement may be admitted. See Colina, 570 So.2d at 932 ("[D]efense counsel was merely trying to show that Castro had made various statements about the Diazes from which the jury could infer that Castro knew the Diazes.").
The statements were also admitted to establish that Foster had a motive for killing Schwebes as soon as he found out about Schwebes' promise to tell the authorities the next morning. As in Escobar, where a defendant's hearsay statement that "he would kill a police officer before he would go back to jail" was admitted to show motive, the statements here established a motive to kill Schwebes and prevent him from reporting the group to the authorities. Escobar, 699 So.2d at 997. For both of these purposes, knowledge and motive, the truth of the matter asserted is not an issue. Additionally, knowledge and motive were both material for the prosecution to demonstrate why Schwebes was killed. See Koon v. State, 513 So.2d 1253, 1255 (Fla.1987) (admitting statement to show that, having heard it, the defendant could have formed the motive to kill a witness, rather than admitting it for the truth of the matter asserted). We conclude the statements were properly admitted.
Foster's next hearsay challenge relates to the testimonies of Young, Magnotti, and Shields that Black said that Schwebes "had to die." The State argues the statements were properly admitted as those of coconspirators. That is, the State asserts, a statement of a coconspirator of the party made during the course and in furtherance of the conspiracy may be admitted since it is not being offered for its truth but rather to establish the conspiracy and the defendant's participation in it. See § 90.803(18)(e), Fla. Stat. (1997).
To qualify under this exception, the existence of the conspiracy must be proven by a preponderance of the evidence and independent of the hearsay statements. See Romani v. State, 542 So.2d 984, 986-87 (Fla.1989). Here, there was independent evidence establishing the conspiracy. For instance, Black himself admitted to participating in the conspiracy and saying that Schwebes had to die. There was also testimony from members of the group regarding the planning and the carrying out of the killing (i.e., finding out Schwebes' place of residence and replacing the birdshot with the more lethal ammunition) and *916 testimony from Young about Foster's admission to, and description of, carrying out the killing the following day. We agree these statements were properly admitted.
Next, Foster challenges the testimony of David Adkins, whom Schwebes had dinner with immediately after the confrontation with the members of the Lords of Chaos and disclosed his intent to report the group. Unlike the testimonies of the group members, Adkins' testimony was hearsay and we can find no exception allowing its introduction. Adkins' testimony was also clearly cumulative considering that Black and Torrone had already testified to what Schwebes said to them; and Magnotti, Shields, and Young had also testified as to what Black and Torrone told them after their confrontation with Schwebes. However, we find any error in the admission of Adkins' testimony to be harmless in light of the substantial unrebutted direct evidence establishing Foster's knowledge and motive concerning Schwebes' statements. See Moore v. State, 701 So.2d 545, 550 (Fla. 1997) ("Because there was direct evidence from other witnesses that Moore possessed a gun on the actual day of the murder and direct evidence that Moore shot the victim, there is no reasonable possibility that the error contributed to the conviction here.").
Next, Foster argues that the testimony of Shields and the introduction of his taped statement on redirect constituted hearsay. On direct examination, Shields testified to his involvement in the conspiracy and the murder of Schwebes. Specifically, he testified as to the plan to vandalize the school, the confrontation with Schwebes as he saw it from where he stood that night, Black's account of the confrontation with Schwebes, Black's suggestion that Schwebes had to die and Foster's immediate agreement and subsequent planning of the murder, and the actual description and execution of the murder. On cross-examination, defense counsel asked numerous questions implying that Shields' testimony was motivated by the deal he made with the State. On redirect and over defense counsel's objection, the trial court allowed Shields to testify about his taped statement to law enforcement officers immediately after his arrest, and before any plea negotiations were discussed. The State was also allowed to introduce and play the taped statement to buttress Shields' direct testimony as a prior consistent statement. Foster argues the trial court erred in admitting this testimony.
A prior consistent statement of a witness who testifies at trial and is subject to cross-examination concerning that statement is excluded from the definition of hearsay when the statement is offered to "rebut an express or implied charge ... of improper influence, motive, or recent fabrication." § 90.801(2)(b), Fla. Stat. (1997); see also Chandler v. State, 702 So.2d 186, 198 (Fla.1997); Rodriguez v. State, 609 So.2d 493, 499 (Fla.1992).
In Rodriguez, following defense counsel's references to plea agreements entered into by two prosecution witnesses, the court allowed statements the witnesses made prior to the plea agreement to rebut the inference of improper motive to fabricate. See Rodriguez, 609 So.2d at 499. Arguably, defense counsel's line of questioning here was an attempt to show bias or recent fabrication on the part of Shields. In fact, the questioning was very similar to that in Rodriguez in that it questioned Shields' motive for testifying against Foster. Hence, the testimony and the introduction of the tape on redirect were proper to show that Shields' testimony at trial was consistent with his statement to law enforcement officers prior to the plea agreement. We also conclude that any error in allowing the testimony and the tape of Shields on redirect would have been harmless in light of the overwhelming evidence against Foster. See Moore, 701 So.2d at 549.
*917 The last hearsay-based claim of Foster deals with a portion of Ms. Magnotti's testimony. At trial, she was allowed to testify about a telephone conversation in which Ms. Foster allegedly attempted to persuade her to assist Ms. Foster in making up an alibi for Foster. Specifically, Ms. Magnotti testified that Ms. Foster wanted her to corroborate that Magnotti and her son spent the evening at Foster's home on the night of the murder. Foster argues that the testimony was hearsay and should not have been admitted. The State counters that Ms. Magnotti's testimony was offered to prove "the falsity of the matter asserted, i.e., that Magnotti did not spend the night at Foster's house, and thus it was not hearsay." (Emphasis supplied.) It should be noted that Ms. Foster never testified that Magnotti spent the night at the Fosters; in fact, she specifically denied so during cross-examination. Also, Magnotti himself testified as to the time he left Foster's house. Therefore, there was no "falsity" to be proven by the prosecution and we agree Ms. Magnotti's testimony should not have been allowed. Although the trial court erred in admitting this statement, we conclude that the error was harmless in light of the remaining evidence presented against Foster. See Moore, 701 So.2d at 549.

Judge's Comments
In issue three, Foster asserts that comments made by the trial judge during the guilt phase demonstrate that the judge had prejudged the case and did not preside over the trial with an open mind. One of the comments referred to by Foster came up as follows:
[Trial judge]: Well, okay, back to the case that you cite. You say thatI know the theory in which it comes in, but when did it come in in that case, or in the particular?
[State]: From the reading of the case, I don't know at what point in time it came in. This is Chandler, this is Cardali.
[Trial judge]: Okay. You have any other argument?
[Defense counsel]: Judge, we're objecting to this strongly. I think it's highly improper. If you allowed this tape where someone gives a statement for the State and after cross-examination play a statement, they could do that on every witness.
[Trial judge]: Okay.
[Defense counsel]: You don't seem concerned, but I think it's highly improper.
[Trial judge]: Tell it to the supreme court. You'll get an opportunity, I believe.
[Defense counsel]: I certainly hope the Court's not prejudging our case.
[Trial judge]: Not for me to make that decision, it's for them. Guilt or innocence.
[Defense counsel]: It may not be going to the supreme court, Judge.
[Trial judge]: Whatever.
This claim is clearly procedurally barred because Foster failed to make contemporaneous objections at trial to the trial judge's comments or seek his disqualification. See J.B. v. State, 705 So.2d 1376, 1378 (Fla. 1998) (holding that except where a fundamental error exists, to raise an error on appeal, a contemporaneous objection is required at the trial level when the alleged error occurred).
Nevertheless, having reviewed all the comments cited by Foster, we conclude that neither the cited comments nor the record as a whole show any bias on the part of the trial court. We note, however, that judges should avoid making such comments. As stated in Peek v. State, 488 So.2d 52 (Fla.1986), judges must make sure that their conduct and comments do not lead to even the appearance of bias. That standard of conduct is required not merely for the sake of professionalism, but more importantly to maintain a high level of confidence in our criminal justice system from all parties.

*918 Avoid Arrest Aggravator

As to the penalty phase, Foster asserts in issue four that the trial court erred both in finding and submitting to the jury the avoid arrest aggravator. Section 921.141(5)(e), Florida Statutes (1997), provides the following aggravator: "The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." In Consalvo v. State, 697 So.2d 805 (Fla.1996), we recently stated the application of this aggravator as follows:
Typically, this aggravator is applied to the murder of law enforcement personnel. However, the above provision has been applied to the murder of a witness to a crime as well. In this instance, "the mere fact of a death is not enough to invoke this factor.... Proof of the requisite intent to avoid arrest and detection must be very strong in these cases." In other words, the evidence must prove that the sole or dominant motive for the killing was to eliminate a witness. Mere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator. Likewise, the mere fact that the victim knew and could identify defendant, without more, is insufficient to prove this aggravator.
Additionally, a motive to eliminate a potential witness to an antecedent crime can provide the basis for this aggravating circumstance. And, it is not necessary that an arrest be imminent at the time of the murder. Finally, the avoid arrest aggravator can be supported by circumstantial evidence through inference from the facts shown.
Id. at 819 (citations omitted). We conclude that the State presented sufficient evidence that Foster and his friends committed the killing for the purpose of avoiding arrest for their prior crimes. As argued by the State, the members of the group directly testified that once Schwebes told Black and Torrone he would report them to campus police the next morning, the group decided that Schwebes had to die that night. In Fotopoulos v. State, 608 So.2d 784 (Fla.1992), upon which the trial court relied, the dominant reason why the victim was killed was because of his knowledge of the defendant's alleged involvement in counterfeiting activities. We found that sufficient to support this aggravator. See id. at 792. Here, Schwebes was aware of the act of vandalism committed that night at Riverdale. With regard to Foster's argument that Schwebes may not have actually seen him that night as he ran from the auditorium, the State established that Foster was concerned that he would ultimately be implicated should either Black or Torrone get arrested. We therefore conclude that the trial court properly submitted and relied upon this aggravator in the sentencing phase.

Submission of Charging Information at Spencer Hearing
In issue five, Foster argues that the trial court erred in admitting the charging information at the Spencer sentencing hearing. Specifically, as additional support for the avoid arrest aggravator, the State, over Foster's objection, introduced into evidence an information in a separate case charging Foster with twenty-seven counts. These twenty-seven counts included the various crimes allegedly committed by Foster and the Lords of Chaos during the time preceding the murder.
We agree that an indictment or information for a crime other than the one being prosecuted should not be admitted as evidence of aggravation. See Dougan v. State, 470 So.2d 697, 701 (Fla.1985) ("An indictment or information is not evidence against an accused, but, rather, is nothing more or less than the vehicle by which the State charges that a crime has been committed."). Further, the consideration of a defendant's prior record is limited to convictions and the convictions are themselves limited to "another capital felony or ... felony involving the use or threat of violence *919 to the person." Perry v. State, 395 So.2d 170, 174-75 (Fla.1980) (quoting section 921.141(5)(b), Florida Statutes, and citing Provence v. State, 337 So.2d 783 (Fla.1976)).
We conclude the trial court should not have admitted the charging information at the Spencer hearing. As stated in Dougan and Perry, the charging information reflected nothing more than mere charges, not evidence, against Foster. The State's argument that Foster later pled to most of the charges is unsatisfactory since the plea agreements were subsequent to both the guilt and penalty proceedings. Subsequent to the Spencer hearing, had Foster pled to all of the charges, the charging information would have still been improperly admitted. The fact that he only pled to some of the charges, however, only highlights the impropriety of having admitted the charging information to begin with.
Although we find that the admission of the charging information was improper, we note that this case is substantially distinguishable from the above cases. In Dougan and Perry, the information or indictment was actually presented to the juries before they rendered their advisory sentences. In the instant case, however, the State introduced the information at the Spencer hearing, after the jury had made the sentence recommendation. In addition, while a detailed list of criminal charges may not have been in evidence, there was evidence that the Lords of Chaos had committed numerous criminal acts and that criminal activity was its purpose. Because the information was not admitted to the jury and because there was evidence of other crimes already in the record we find any error harmless. See Mendoza v. State, 700 So.2d 670, 678 (Fla.1997) ("[E]rroneously admitted evidence concerning a defendant's character in a penalty phase is subject to a harmless error review."). Importantly, we also find no indication that the trial court relied on the information in sentencing Foster.
Foster also points out that the trial court, in the sentencing order, incorrectly stated that the Lords of Chaos were engaged in criminal activities for two months before the murder even though the group had actually been in existence for less than a month. The length of time that the group was in existence was not a material issue in any part of the case and was not heavily relied upon, if at all, by the trial judge in determining the sentence. Therefore, we conclude such error was harmless. See Consalvo, 697 So.2d at 818 (Fla.1996) (error complained of was harmless where it did not contribute to the sentence of death).

Mitigating Circumstances
In issue six, Foster asserts that the sentencing order does not support the death sentence in light of the trial court's failure to consider the mitigating evidence and because of the inadequacy of its findings. Particularly, the trial court failed to provide the grounds for rejecting Foster's age, eighteen at the time of the murder, as a mitigator.
The determination of mitigating circumstances and the weight assigned to each one is within the discretion of the sentencing court. See Campbell v. State, 571 So.2d 415, 420 (Fla.1990). In Campbell, we provided the following in emphasizing the duty of the sentencing court in evaluating the mitigating circumstances offered by the defendant:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature.... The court next must weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider *920 in its written order each established mitigating circumstance.
Id. at 419-20 (citations and footnotes omitted). Recently, however, in Trease v. State, 768 So.2d 1050, 1055 (Fla.2000), the Court partly receded from Campbell and held that though a court must weigh all the mitigating circumstances, such court may assign "little or no" weight to such factors as warranted by the relevant circumstances.
The sentencing judge in his written order substantially followed the dictates of Campbell. The court provided a written evaluation of both sets of aggravating and mitigating circumstances. As to the mitigating circumstances, the court addressed, as proffered, Foster's age and a list of proposed mitigating circumstances. Thus, the instant case is far different from others where we have found that the sentencing judge simply failed to provide an adequate written account of the evaluation of mitigating circumstances. See, e.g., Jackson v. State, 704 So.2d 500, 506 (Fla.1997) (finding inadequate a sentencing order which concluded without any explanation that the testimony offered in support of mitigation was not credible); Ferrell v. State, 653 So.2d 367, 371 (Fla.1995) (finding sentencing order inadequate where it was made up solely of conclusory statements).
While the court did not evaluate in detail each of the asserted twenty-three nonstatutory mitigating circumstances in the exact order submitted by Foster, the court provided sufficient written grounds for its evaluation and its sentence. See Armstrong v. State, 642 So.2d 730, 739 (Fla.1994). Here, the sentencing court addressed the proffered mitigating circumstances but did not go into the ones deemed redundant. For example, Foster submitted numerous mitigating circumstances relating to his good personality and character traits. The court, however, addressed the defendant's character traits at once in a three-paragraph subset of its analysis of the mitigating circumstances. Hence, we find the asserted error to be harmless in that the court did in fact address the mitigating circumstances and provided sufficient written support. See Thomas v. State, 693 So.2d 951, 953 (Fla. 1997).
Finally, with regard to mitigation, Foster claims error in the trial court's rejection of Foster's age at the time of the killing as a mitigator. Section 921.141(6)(g), Florida Statutes (1996), expressly includes the age of the defendant at the time of the crime as a mitigating circumstance. We have recognized, however, that there is no bright-line rule for applying this provision. See Campbell v. State, 679 So.2d 720, 726 (1996). The appropriate application of this mitigator goes well beyond the mere consideration of the defendant's chronological age. See id. Rather, it entails an analysis of factors which, when placed against the chronological age of the defendant, might reveal a much more immature individual than the age might have initially indicated. Although trial courts are given wide discretion in ultimately determining the existence of this mitigator, they nonetheless must carefully assess all the factors which may impact upon this mitigator.
Relying on Mahn v. State, 714 So.2d 391 (Fla.1998), Foster argues that the trial court improperly rejected his age at the time of the killing as a mitigator. Consistent with the principle enunciated in Campbell, 679 So.2d at 726, in Mahn we held that for a defendant's age to be given any significant weight, "it must be linked with some other characteristic of the defendant or the crime such as immaturity." Mahn, 714 So.2d at 400 (quoting Echols v. State, 484 So.2d 568, 575 (Fla.1985)). We then found that the sentencing court failed to consider Mahn's "unrefuted long-term substance abuse, chronic mental and emotional instability, and extreme passivity in the face of unremitting physical and mental abuse" as a link between his youthful age and immaturity. Id.
*921 As pointed out by the State, however, the facts in Mahn are vastly distinguishable from the present case. The record simply does not contain any evidence remotely similar to the substantial emotional and mental problems in Mahn. As the sentencing court pointed out, Foster had completed his GED requirement, taken college and vocational-technical courses, and was the leader of the young men of the Lords of Chaos. Foster produced no evidence of any emotional or mental irregularities, chronic or otherwise, despite the availability of two mental experts. In fact, the evidence established that Foster was of above-average intelligence. We therefore conclude that the court properly evaluated Foster's age as a mitigator.

Proportionality
In this last issue, Foster asserts that the death sentence is not proportional in this case. Due to the uniqueness and the finality of death, we address the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). To ensure uniformity in the imposition of the death sentence, we review and consider all the circumstances in a case relative to other capital cases. See Terry v. State, 668 So.2d 954, 965 (Fla.1996); Tillman v. State, 591 So.2d 167, 169 (Fla.1991) ("[P]roportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law.").
Here, the trial court found two serious aggravators (avoid arrest and CCP), no statutory mitigators and some nonstatutory mitigators. The trial court accorded great weight to both aggravators and assigned very little weight to the mitigators proposed by Foster. As discussed above, the avoid arrest aggravator was proven beyond a reasonable doubt.
Although Foster does not challenge the CCP finding, a brief analysis of the aggravator is appropriate. In essence this aggravator applies to an execution-style killing that has been calmly and coldly planned in advance. As an example, we have found CCP where a defendant "told others in prison that when he got out he was going to kill the victim; told [someone] that he was going to escape, get his shotgun, kill the first person he saw, steal the person's vehicle, and leave the area; concealed himself in the victim's barn and waited for him; and then kidnapped and murdered the victim and stole his truck." Monlyn v. State, 705 So.2d 1, 6 (Fla.1997). Accordingly, to establish CCP:
[T]he jury must first determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Woods v. State, 733 So.2d 980, 991 (Fla. 1999) (quoting Gordon v. State, 704 So.2d 107, 114 (Fla.1997)). To avoid any confusion with the premeditation element required to prove first-degree murder, the trial court is required to instruct and emphasize to the jury that CCP involves a much higher degree of premeditation.
This case appears to present a classic case of a cold and ruthless execution-style killing by a group of young men who knew exactly what they were doing. The sentencing order and the record reveal that Foster and the group carefully planned the killing of Schwebes. To begin, Foster and the group discussed several alternatives before ultimately choosing Foster's plan. Foster got his shotgun and replaced the birdshot it carried with the more lethal # 1 buckshot to ensure Schwebes' death. Foster and the group then obtained gloves and ski masks to hide their identities. Each member of the group had a specific assignment as directed by Foster. Finally, Foster looked *922 Schwebes right in the eye before shooting him in the face and the buttock. These facts strongly support the finding of CCP, as found by this Court in somewhat similar circumstances. See Bell v. State, 699 So.2d 674, 677 (Fla.1997).
Recently, we affirmed the imposition of a death sentence upon an eighteen-year old where the trial court found three aggravators (HAC, CCP, and commission during a robbery), one statutory mitigator (age of eighteen), and a number of nonstatutory mitigators. See Nelson v. State, 748 So.2d 237 (Fla.1999). Similarly, we conclude the death penalty is not disproportionate here in light of the presence of two strong aggravators and the absence of statutory and nonstatutory mitigators. See, e.g., Davis v. State, 703 So.2d 1055, 1061-62 (Fla.1997) ("Where there are one or more valid aggravating factors that support a death sentence and no mitigating circumstances to weigh against the aggravating factors, death is presumed to be the appropriate penalty.") (quoting Blanco v. State, 452 So.2d 520, 526 (Fla.1984)); Sliney v. State, 699 So.2d 662, 672 (Fla.1997) (finding the death penalty proportional with the existence of two aggravators (commission during a robbery and avoid arrest), two statutory mitigators (age and lack of criminal history), and a number of nonstatutory mitigators); Hayes v. State, 581 So.2d 121, 126-27 (Fla.1991) (upholding the death penalty where there were two aggravators (CCP and commission during a robbery), one statutory mitigator (age), and other nonstatutory mitigators).
Foster also points out that he was the only one sentenced to death out of the four participants in the crime, further arguing the disproportionality of his sentence.[9] While a death sentence is not disproportionate per se because a codefendant receives a lesser punishment for the same crime, especially when he is less culpable, see Hannon v. State, 638 So.2d 39 (Fla.1994), we agree the sentence of an accomplice may indeed affect the imposition of a death sentence upon a defendant. See Gafford v. State, 387 So.2d 333, 337 (Fla.1980); Salvatore v. State, 366 So.2d 745, 751 (Fla.1978). However, we have found with some limited exceptions that the defendant who actually plans and kills the victim is usually the most culpable, and his death sentence will not be considered disproportionate in comparison to his codefendants' lesser sentences. See Sliney, 699 So.2d at 672 (death sentence not disproportionate because defendant was more culpable than codefendant); Cook v. State, 581 So.2d 141, 143 (Fla.1991) (defendant's death sentence was not disproportionate to sentences of his accomplices, whose level of participation in murder was clearly less than defendant's, and where it was defendant, not his accomplices, who killed victims). Here, the record reveals that Foster was the dominant person in the crime, he planned the killing, assigned the various tasks to the participants, procured *923 the shotgun and the ammunition, and actually shot and killed Schwebes. Under these circumstances we conclude the death penalty is not disproportionate.
Accordingly, for the reasons stated in this opinion, we affirm Foster's conviction and sentence.[10]
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
WELLS, C.J., concurs with an opinion.
WELLS, C.J., concurring.
I concur in affirming the conviction. I do not concur in that portion of the opinion concerning the judge's comments.
I concur in result only as to the sentence.
NOTES
[1] Adkins testified that he saw Schwebes' vehicle parked at the spot where Black and Torrone were caught by Schwebes at about 9:30 p.m. He also saw someone running from the general location of Schwebes' vehicle.
[2] The two witnesses testified to hearing a car with a loud muffler leaving immediately after the two shots. Shields' car had a bad muffler. One testified to seeing a car driving away.
[3] Pursuant to plea agreements with the State which required truthful testimony against Foster, the group members were sentenced as follows: Black and Shields were sentenced to life without the possibility of parole; Magnotti was sentenced to thirty-two years' imprisonment; Burnett was sentenced to two years in county jail for non-homicidal offenses; Torrone was sentenced to one year in county jail, ten years probation, one hundred hours of community service and restitution. As to the other members, the record does not indicate whether there was any plea agreement or any jail or prison sentences.
[4] Spencer v. State, 615 So.2d 688 (Fla.1993).
[5] See § 921.141(5)(e), Fla. Stat. (1997).
[6] See § 921.141(5)(i), Fla. Stat. (1997).
[7] Even though Foster referred to the 23 mitigators as nonstatutory, the trial court treated them as statutory pursuant to section 921.141(6)(h), Florida Statutes (1997).
[8] The seven issues are: (1) his numerous pretrial change of venue motions were improperly denied; (2) the court erred in permitting the State to elicit hearsay testimony of several witnesses; (3) comments of the trial court during the guilt phase demonstrate that the court had prejudged the case; (4) the avoid arrest aggravator should not have been submitted to the jury in the penalty phase; (5) the trial court erred in admitting the charging information at the Spencer hearing; (6) the trial court failed to properly consider the mitigating circumstances and its findings are unclear; and (7) the sentence was disproportionate in comparison to other cases.
[9] We note that Immediately before jury selection, Foster turned down a plea offer of life without parole on the murder count:

[State]: Yesterday afternoon I did contact Mr. Jacobs at the public defender's office and we did extend an offer in this case of life imprisonment ... That offer I guess up until this time is still open. However, it's my understanding that he would be rejecting that.
[Defense counsel]: I spoke to my client last night upon receipt of the offer at the jail. I told him I wanted to [sic] him to sleep on it. I talked to him this morning, and it's my understanding that he is turning down the offer; is that correct, Kevin?
[Foster]: Yes, sir.
[Defense counsel]: Do you understand that if you accepted the State's offer the case will be over today and you will receive a sentence of life without parole; you understand that?
[Foster]: Yes.
[Defense counsel]: The State would be willing to waive the death penalty at this point in time.
[Foster]: I understand that.
[Defense counsel]: And knowing all those facts, is it your decision to turn down the State's offer?
[Foster]: Yes, it is.
[State]: At this point the offer will be withdrawn.
[10] Though Foster did not raise a sufficiency of the evidence claim, after reviewing all the evidence in the record, we also find that there is sufficient evidence to support his conviction for first-degree murder.