902 So.2d 253 (2005)
Michelle Leigh SPARKMAN, Appellant,
v.
STATE of Florida, Appellee.
No. 4D03-4737.
District Court of Appeal of Florida, Fourth District.
May 18, 2005.
*254 Carey Haughwout, Public Defender, and Jeffrey Anderson, Assistant Public Defender, West Palm Beach, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Myra J. Fried, Assistant Attorney General, West Palm Beach, for appellee.
POLEN, J.
Michelle Leigh Sparkman appeals her conviction for manslaughter and sentence of fifteen years in prison. Because the trial court committed harmful error in admitting Detective Brock's out-of-court comments regarding his beliefs and theories that Sparkman killed the child, we reverse and remand this case to the trial court.
Sparkman and William Jason Mikus began living together in June of 2000. Mikus had a child, Courtney, who was 14 months old. Sparkman had two children, Jeremiah, age four, and Kaley, who was five or six months old. Courtney had a history of sleep apnea and was hospitalized in the past for what Mikus believed to be seizures. She would stop breathing and her body would stiffen up. It had been recommended that Courtney be evaluated by a neurologist but Mikus did not take her to see one.
On September 1, 2000, Mikus went to work around 7 a.m. Sparkman brought him lunch and took Courtney along with her. Courtney appeared playful and a little tired. Later, Sparkman called Mikus and said Courtney had fallen off the bed onto a table, breaking an ashtray. Sparkman said Courtney was not hurt and had gotten back up smiling and laughing.
*255 Joseph Hubbard, Jeremiah's father, went to the house that evening from nine-thirty to eleven. He did not notice any unusual behavior by Courtney. She was walking around drinking her bottle, climbed onto a sofa, and was playing. He had occasion to see Courtney's head and face and he did not notice any injuries. However, he wasn't really paying attention to Courtney because he was playing with Jeremiah.
When Mikus arrived home from work late that evening, Courtney was in bed asleep, and he looked at her briefly as he was going to bed. He was the last person to see Courtney that night.
The next day, September 2, 2000, Mikus did not notice any unusual behavior from Courtney. When Mikus left for work around 11:15 a.m., Courtney was playing but getting tired. Mikus and Sparkman told her to go to bed and Courtney cried but got up and got in her bed. Sparkman went back to check on her and Mikus left for work. Mikus called around noon and he could hear Courtney screaming and crying in the background. Mikus asked if everything was all right and Sparkman told him yes, but that Courtney did not want to go to sleep.
At about 12:15 p.m., Sparkman called Mikus and told him that something was wrong with Courtney. She said that Courtney was not moving and was barely breathing and that Mikus needed to come home now. Mikus arrived home five to seven minutes later. He ran into the bathroom and saw Sparkman washing vomit off of Courtney, who was slumped over. Mikus told Sparkman to call 911 and he began to perform CPR on Courtney. Her heartbeat was very weak and her breathing was very shallow. She looked like a rag doll. Right before the ambulance arrived, Courtney had a seizure  her whole body tightened up, her hands and feet rolled up, and she was shaking and spitting up mucous.
Once EMS arrived, they took her straight to the back of the ambulance, put tubes down her throat and gave her seizure medication. Jay Curtis, an EMT at the scene responsible for working on her airway, said that Courtney's body was limp and unresponsive. He saw her body stiffen. As Courtney's circulation started to return, he noticed what looked like fingerprints from a medium adult person in her neck and face area.
Courtney had red marks around her neck area, scratches on her face and a bruise on her forehead. Mikus testified that Courtney had the cheek scratch and forehead bruise before he left for work that morning, but that in the afternoon she had additional injuries: a bruise behind her ear, her earring smashed into the side of her head, bruising around her neck, small bruises on her face, and bruising on her chin. However, Deputy Donna Lee testified that Mikus told her at the hospital that he had noticed the bent earring that morning before he left for work. Lee also testified that Mikus did not appear too concerned about Courtney.
Courtney was taken to the hospital and was then medivaced to St. Mary's in West Palm Beach. She died two days later. The District Medical Examiner, Dr. Roger Middleman, testified at trial as to the autopsy report done by Dr. Hobin as well as to his own examination of Courtney's brain. Dr. Middleman testified that "based on the totality of the information this is a homicide and the cause of death is blunt or trauma head.... It was called not so blunt, but simply traumatic injuries to the head." Dr. Middleman testified that Courtney did not die a natural death and that it would be "very doubtful" that her head injuries could have been caused by falling from a bed and hitting a table in *256 any fashion. The force required would be "a batting into the wall with force, striking an object on the child's head, automobile accident, falling from a great height." Dr. Middleman agreed with Dr. Hobin that this was a traumatic type of death, but he disagreed with Dr. Hobin's classification of the manner of death as "undetermined," believing instead that it was a homicide.
Dr. Middleman testified that there were no fractures or rib cage bruises, which is "one of the things you can see with shaken baby." He also viewed the taped interview of Sparkman demonstrating how she claims she shook Courtney and he said that the shaking was not very forceful.
Dr. Middleman also said that, although Courtney had a history of blue spells or cyanosis, those would not cause hemorrhages in the head. Courtney's external injuries could have been independent of the ultimate cause of death. Dr. Middleman testified that whatever happened to Courtney happened near to the time she went limp, not days before. If the trauma was sustained days before, she would not have been able to walk around, hold toys, climb on beds, and eat meals and then suddenly collapse  she would have already been deteriorating and exhibiting decreased mental status.
Sparkman gave a taped statement to Officer William Garrison on September 2, 2000. Sparkman indicated that the abrasion above Courtney's right eye occurred when she fell off the bed onto a table the previous day. The bruise on Courtney's right cheek was from tripping over toys and hitting the corner of a coffee table about a week earlier. Sparkman could not explain how Courtney obtained bruises around her temple area. She noticed the bent earring the previous day because Courtney was pulling on her ear. Sparkman had not noticed the bruising on Courtney's neck and shoulder. She had no idea how Courtney's finger was broken and did not notice that it was swollen. She said the scratches on Courtney's neck were from their new cat. She didn't know anything about the marks on Courtney's neck.
According to Sparkman, Courtney seemed cranky and tired before breakfast on September 2, but Sparkman thought that she was just hungry. Mikus brought breakfast home around nine. Courtney ate all her pancakes and sausage. Sparkman laid her down around 10 a.m. and Courtney slept for about an hour. She awoke, came into the TV room and began playing with her toys. Then she lay down as if she was going back to sleep by the TV. She didn't respond when Sparkman tried to talk to her. Sparkman then picked up Courtney and she went limp. When she did not respond, Sparkman began to shake her because she believed she was not breathing. Sparkman put cold water on Courtney and Courtney still did not respond. Sparkman called Mikus, who arrived home a couple minutes later. He tried to get Courtney to respond, to take her pulse, and to perform CPR on her. She threw up on Mikus just as he arrived.
Sparkman also stated in the September 2, 2000 interview that Mikus had told her about Courtney's history of seizures. She and Mikus had seen her have a seizure before and she was okay after they shook her. Additionally, neither Sparkman nor Mikus had disciplined Courtney on September 1 or September 2.
Sparkman gave a videotaped statement to Detective T.J. Brock on June 14, 2002. Sparkman again recited the events of September 1 and September 2, 2000 leading up to Courtney's seizure. Sparkman said that when Courtney didn't respond she panicked and started shaking her. Sparkman also demonstrated how hard she shook Courtney using a doll. Sparkman *257 was screaming "Courtney, wake up. Courtney" and kept shaking her. She shook her for a few minutes. When Courtney started to spit up, Sparkman ran her to the bathroom and washed her mouth off. Then she called Mikus and told him he needed to come home because she couldn't get Courtney to wake up. Sparkman sat down in the rocking chair holding Courtney and waited for Mikus to come home. When Mikus arrived, he took Courtney out of Sparkman's arms and attempted to resuscitate her. Then Sparkman called 911.
In the videotaped statement Sparkman gave to Detective Brock, she said she did not do anything to hurt Courtney. She does not believe that her death was caused by the earlier fall. She stated she didn't do anything to hurt Courtney and she was not mad or aggravated at her. She was not mad when she shook Courtney; she was scared. Sparkman did not think that Courtney's vomiting was from the shaking; she thought Courtney was having a seizure. She knows that if she didn't do something to cause Courtney's death then Mikus was the only other person who could have caused her death.
Sparkman was charged by information with murder in the second degree. At trial, the tape of Sparkman's statement to Officer Garrison was played to the jury. The videotape of Sparkman's statement to Detective Brock was also played. The trial court denied Sparkman's motions for judgment of acquittal. The jury found Sparkman guilty of manslaughter, a lesser included offense, and she was sentenced to fifteen years in prison.
On appeal, Sparkman argues that the trial court erred in not ruling on her contemporaneous objections to Detective Brock's commentary during his videotaped interview of her. We agree and reverse.
During trial, when the state offered the videotape of Sparkman's statement to Brock, Sparkman objected on the basis that there were "significant portions" of the interview where (1) the detective does most of the talking and is not related to any question and (2) "there are some statements that he makes that are responded to either with silence or not necessarily that the transcriptionist says are uh huh, which is not really an admission." Defense counsel admitted that the prosecutor had asked him to review the tape and provide his objections pre-trial, but he declined to do so. The prosecutor had also excised two portions on his own, which as an officer of the court he felt needed to be removed. The prosecutor explained that defense counsel knew that it would take a full day to edit the tape and that the court did not want the jury waiting that long.
The following excerpts of the video transcript highlight a few of the multiple statements by Brock which constitute inadmissible hearsay. These include Brock's recitation of facts and his beliefs and theories of the case. Many of these statements are not questions to Sparkman but rather consist of Brock informing Sparkman of what he believed happened and of what the doctors' opinions were. Brock concludes with his judgment that Sparkman killed Courtney by shaking her:
DETECTIVE BROCK: Because I  I want to share with you what  what I've just been working on, okay. Here  here you are, you're tired. And I think that you had  you and Jason had a long night of arguing. Okay. I think, uh, that this ashtray  actually not that ashtray, but this ashtray was broken that night after Jason came home and you and him argued. This table may  may have been knocked over. Uh, there is no way a twenty-four pound baby is going to be able to fall here that far away from the table and cause this table to fall over. *258 Okay. And for her to break it you've got carpet and underneath that carpet there is padding, you could throw that heavy, heavy ashtray on the floor and it would  it would not break. It's just  that's a very difficult, uh, thing to do. So I think that you and Jason were really, uh, had a little bit of heated argument the night before. You know what I'm saying.
SPARKMAN: Uh huh.
* * *
DETECTIVE BROCK: Based on everything that I've looked at in the investigation, uh, I believe that at the point when you shook Courtney that's when she suffered that subdural hematoma. She began to vomit. And, you know, the shaking of her for so long, uh, was the cause of her death. Okay. Has anybody threatened you in any way to make a statement?
SPARKMAN: No.
The trial court ruled that Sparkman's contemporaneous objections were untimely because Sparkman should have filed a pre-trial motion pursuant to Rule 3.190 of the Florida Rules of Criminal Procedure: "Now the defense wants the court to hear in round numbers somewhat less than a hundred objections they have to the state's two and a half hour taped statement when the grounds for these objections were known some fifteen months ago." The court considered the objections waived and refused to address them on the merits.
The first issue presented is a purely legal question  whether Sparkman's objections to Brock's statements had to be made pretrial. Therefore, the standard of review is de novo. Am. Fed'n of Labor & Congress of Indus. Orgs. v. Hood, 885 So.2d 373, 374 (Fla.2004). While it is always good practice for counsel to raise known objections pretrial, and counsel may be compelled to do so by order of the court, Rule 3.190 does not require Sparkman to object pretrial to raise the instant issue. Rule 3.190 addresses the necessity of pretrial objections for a "Motion to Suppress Evidence in Unlawful Search" and a "Motion to Suppress a Confession or Admission Illegally Obtained." Fla. R.Crim. P. 3.190(h), (i). Nowhere in Rule 3.190 is a party required to object pretrial to the interviewing officer's legally obtained statements, if such objections go to specific questions or answers within the statement. Additionally, in Newsome v. State, 735 So.2d 546 (Fla. 4th DCA 1999), the prosecution presented to the jury a tape recording of an interrogation of defendant that included a hearsay statement by a police officer. This court described defense counsel's objection during trial to the admission of the hearsay evidence as "timely." Id. at 546. See also Pausch v. State, 596 So.2d 1216 (Fla. 2d DCA 1992) (pre-trial objections not required to reverse conviction based on playing of tape of officer's statements during questioning of mother-defendant about her child's death). Based on the foregoing, we hold that the trial court erred in finding Sparkman's hearsay objections waived as untimely.
The second issue presented is whether the trial court's admission of the videotape into evidence was right for the wrong reason. See, e.g., Brown v. State, 648 So.2d 268, 270 (Fla. 4th DCA, 1995) ("In deciding the issues in this appeal, we are not restricted by the state's response. If there is any basis on which a trial court's ruling is correct, it should be affirmed."). The state contends that the videotape was properly entered into evidence because there was no indication that it was obtained illegally and the detective's interview with Sparkman was not improper hearsay. We disagree and hold that the trial court committed harmful error in admitting *259 Brock's hearsay statements into evidence.
A trial court's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion. Johnston v. State, 863 So.2d 271, 278 (Fla.2003). "Discretion... is abused when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court." LaMarca v. State, 785 So.2d 1209, 1212 (Fla.2001) (citation omitted). The trial court's discretion is limited by the rules of evidence. Id.
These statements by Brock, akin to many others in the videotape, were clearly not adoptive admissions by Sparkman, nor do they meet any of the other exceptions to the hearsay rule listed in Florida Statutes § 90.803. Therefore, we hold that the trial court erred in admitting the videotape as a whole into evidence, without first redacting Brock's inadmissible statements.
Lastly, we hold that the error was not harmless. "If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful." State v. Lee, 531 So.2d 133, 136 (Fla.1988). It is the state's burden to prove that an error was harmless. See, e.g., Knowles v. State, 848 So.2d 1055, 1058 (Fla.2003). As the Florida Supreme Court explained in State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986):
The [harmless error] test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence.
The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict.
In this case, the error was not harmless because Brock's out-of-court comments as to what he believed happened and that he believed Sparkman killed Courtney were so prejudicial that the erroneous admission of the statements cannot be considered harmless beyond a reasonable doubt. Id. at 1135. We therefore reverse Sparkman's conviction and remand this case to the trial court.
We recognize that this case may need to be retried. Therefore, we affirm without discussion the other five issues Sparkman raises on appeal.
WARNER and HAZOURI, JJ., concur.