GROSS, C.J.
Vladimir Eugene was convicted of first degree murder and sentenced to life in prison. We affirm. We choose to address two of his arguments on appeal. First, he contends that the victim’s emails to him were inadmissible hearsay. Second, he argues that the trial court erred in allowing the jury to hear four statements made by interrogating detectives during questioning of Eugene which suggested their belief as to his guilt or “theory as to what happened.”
We provide a detailed review of the evidence to give better context to appellant’s arguments. The 21-year old victim, Kathy Pierre, lived with her family at a house in Miramar. On a July Sunday in 2005, the victim’s younger sister, Edna, woke up at 8:30 a.m. and got ready for work. She went into the victim’s room to get some lotion. Nothing seemed unusual and nothing was out of place. Edna noticed the victim in her bed completely covered by a comforter; this was not the usual way for the victim to sleep.
After Edna left the house, the victim’s mother, Florise, discovered her daughter’s body. She saw marks on the victim’s neck and mouth. The victim had been strangled from behind' with some type of ligature, and something had applied pressure to her face. The victim was in her underwear. There was no evidence of sexual activity or assault; no alien DNA was found. There was also no evidence anywhere in the house that a struggle had occurred. There were no signs of forced entry. The only thing missing in the entire house was a cordless black house phone from a base in the victim’s room.
Appellant, who was Florise’s cousin, had an intensely close relationship with the victim and her family. Thirteen years older than the victim, he began to live with the family when the victim was in elementary school. He and the victim had a special and unique relationship. Although no one ever observed inappropriate sexual contact between them, appellant often slept in the victim’s room. While he stayed with the family, appellant got married and started his own family. The victim did not like appellant’s wife at first, but soon the women became friends. After appellant got married, he continued to frequently sleep in bed with the victim. The victim’s stepfather and mother were aware of this sleeping arrangement but did not think it was unusual. Shortly after *1106 appellant’s first child was born, he moved his family to Boynton Beach.
Even after the move, appellant was a frequent visitor at the victim’s home, often spending nights in the victim’s room. He had a key to the house and knew the code to the alarm system. The victim often spent weekends with appellant and his family in Boynton Beach; during these visits the victim slept in a number of different places, sometimes in bed with appellant. Appellant’s wife commented that it was normal for her husband and the victim to lounge around together in their underwear. Witnesses described appellant and the victim as having a father-daughter relationship, but with physical interaction like a boyfriend and girlfriend who were always “all over” each other and who would tell each other everything. They spent hours talking in each other’s arms. When not together, appellant and the victim would speak every day by phone or over the Internet.
About six weeks before the murder, a rupture occurred in the relationship between appellant and the victim. Appellant got into an altercation with his wife and the victim intervened. Appellant pushed or hit the victim twice. She took offense and broke off the relationship. Her visits with appellant stopped. After the fight with the victim, appellant’s behavior changed — he stayed home, lying in front of the television all day, not wanting to do anything. Appellant told the victim’s mother that he could not afford to lose the victim’s friendship and that he would give his life for her. Over the next few weeks, appellant repeatedly telephoned the victim. Many times the victim refused to take his calls. To try and repair the relationship, appellant sent text messages and emails in which he professed his friendship and love and made it clear that his life was torn apart by losing his best friend. He told Florise that it was “killing” him to lose the victim’s friendship.
The victim’s response to the changed relationship was different than appellant’s. She cut appellant out of her life and, for the first time, began to spend time with other men. Three social friends of the victim were mentioned at trial: Adelyn, the brother of appellant’s wife and a cousin of the victim’s mother; Stephane, a friend of both the victim and Adelyn; and Benny, a boxing instructor. Appellant was jealous that the victim’ had started going out and having fun.
Adelyn lived with appellant and his family. Florise described him as a friend of her daughter. Edna characterized him as a close friend of her sister’s, whose relationship with her did not change in the month before her death. Adelyn and the victim never argued and never had a falling out. Adelyn met the victim through appellant when she visited Haiti several years before the murder. He denied having an intimate sexual relationship with the victim and testified that he had engaged only in “kissing to more intense” heavy petting with her. Adelyn talked with the victim many times over the two days preceding her death. On the night that she died, he stayed in at appellant’s home and had no contact with anyone between 11 p.m. and 8 a.m. the next morning.
About a month before the murder, Benny the boxing instructor started giving the victim boxing lessons for 2.5 hours every weekday. Three days before the murder, they went out on a date. While they were out, the victim received phone calls that upset her. They had plans to go on a second date the weekend of her death. After the murder, appellant told a friend that he never liked the boxing instructor and that he had gone to the gym to check him out, pretending to be a prospective customer. The instructor remembered *1107 showing appellant around on this visit to the gym. Appellant did not think the instructor should be dating a client and did not approve of the victim receiving his late night calls.
Stephane was a friend of both Adelyn and the victim who did not meet appellant until after the murder. The night of her death, the victim went out on a date with Stephane. While the victim was getting ready, Edna used the black cordless phone in her sister’s room. When she was finished, she threw the phone onto the victim’s bed. The victim was in a good mood. She left the house shortly after 9 p.m. About ten minutes later, Edna left the house for her evening out.
The victim picked up Stephane in her car and they went to dinner at Dave & Buster’s. On the way, the victim received a call on her cell phone. Although she was not happy about it, she answered the phone, listened quietly, abruptly hung up, and then was quiet for a while. She received a second call during dinner. Her only contribution to the conversation with the caller was to ask, “Are you done yet?” Phone records later established that appellant called the victim twice while she was out with Stephane. Although his phone was turned off, Stephane received two calls from the victim’s house phone at 12:23 and 12:27 a.m. The victim dropped Stephane off at his house between 12:30 and 1:00 a.m. and said she would call him when she got home. Stephane never received the victim’s call.
When Edna arrived home shortly after 3 a.m., she noticed nothing unusual. The front door was locked. The only way to have locked the door from the outside was with a key. Nothing seemed out of place.
After the victim’s body was discovered, Florise called appellant’s house and spoke to his wife. Appellant was already on his way to the victim’s house. When he arrived, Florise confronted him, but he showed no emotion. Adelyn arrived at the house and spoke to appellant, who said he thought that the boxing trainer was a possible suspect. After talking with the police, Adelyn went to get Stephane, but his car would not start, so he borrowed appellant’s car. Stephane and Adelyn both noticed a black house phone in the car, by the front seat.
When the police later searched appellant’s car, they found the black cordless house phone, which had the same serial and model number as the phone base in the victim’s room. The police called the victim’s number, and the black cordless phone rang. The police also found some jewelry in the glove compartment. Appellant’s conflicting stories about the phone and the jewelry were significant pieces of evidence in the trial.
Several weeks before the murder, Edna and Florise had seen the same jewelry in the victim’s room. The victim showed the jewelry to one of her friends. Appellant told a friend that he had bought the jewelry for his wife and had let the victim look at it. He also told the friend that he had bought the jewelry for the victim. To the police, appellant claimed that he had bought the jewelry for his wife as a present for their fifth wedding anniversary. However, appellant’s wife explained that, as a Jehovah’s Witness, she did not celebrate her wedding anniversary and that her husband had never before given her an anniversary gift.
Several days before the murder, appellant’s wife cleaned out his car. On the night of the murder, she used the car until 9:15 p.m. At no time did she see the jewelry or the black cordless telephone. However, during his first, extensive statement to the detectives, appellant said that he had bought this phone a month before *1108 the murder and that the phone had been in his car ever since. In a later interview, appellant changed his story and told the police that he did not put the phone in his car.
On the night of the murder, appellant left his home around 10 p.m. and did not return until 4 or 5 a.m. He told the police that he was alone, sitting in his car, at a park by the water between 11 p.m. and 4 a.m. He told a friend a different story— that he had been fishing. Appellant had not been fishing for three years. When questioned by the detectives about this discrepancy, appellant maintained that he did not tell his friend anything about going fishing.
Text messages and emails between appellant and the victim gave definition to the intensity of their unique relationship. These are examples of the messages appellant sent to the victim:
I want to reassure you the most important mission for the short time left on this planet is to spoil you with everything the best way I can. Love always, [appellant].
Since the waiting list is long for a date with a hot chick like you, I figure I would ask early. Would you like to see “The Land of the Dead?” It comes out this , Friday. Let me know ASAP because brother needs a makeover, to accompany a beautiful lady like you. I hope I am not far down the list.
I am sorry if I sound like I am pressuring you. Have fun wherever you have to be at. Wherever you have to be, have some for me too.
Hey, Love. I just made the deposit of 200 for you.
The state introduced 19 emails from appellant to the victim and three emails from the victim to appellant. Appellant’s emails are needy and intense. He said he was hurting and mentioned killing himself. He was married to his wife, but his relationship with the victim was greater. He loved his wife, but was in love with the victim. Without the victim, he had no one with whom to discuss personal things. His life was meaningless without her. He liked Adelyn, but warned the victim not to let Adelyn take advantage of her, like kissing him when he was not even her boyfriend. It was killing him inside that he may have lost her to Adelyn, but he was at her mercy.
The victim’s emails to appellant let him know that there had been a sea change in their relationship. For example, in one email the victim told appellant:
I will never get over the fact that you hurt me. I always believed in you. I always thought we would never part. Unfortunately, I can’t get over the fact that the man I loved whole heartedly, nothing holding back, could ever do what you did.
The sad thing is, I still love you the same. I just can’t be around you anymore. I can’t promise you that I will ever contact you again or ever see you again. You hurt me, yet I still love you. I could never hate you because I love you too much.
It’s funny how at that moment, you could look me in my eye and strike me twice, with no hesitation. It won’t happen again, because I won’t be there anymore for it to happen.
It’s funny how you look me dead in the face, in my eyes, and strike me, not once but twice, the person that you claim to love so deeply. Yet, at the same moment, you didn’t strike [your wife]. That goes to show who you really love.
Other emails described the victim’s feelings for Adelyn and her concerns that *1109 other people were interfering in that relationship to “protect” her.
Appellant contends that the victim’s emails to him were inadmissible hearsay. However, the emails were not hearsay because they were offered not for the truth of the matters they contained but to establish the effect that the statements had on appellant, the recipient of the emails.
Subsection 90.801(l)(c), Florida Statutes (2008), defines “hearsay” as a “statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” The Supreme Court has recognized that a statement may “be offered to prove a variety of things besides its truth.” Foster v. State, 778 So.2d 906, 914-15 (Fla.2000). When a statement is not offered for the truth of its contents, but to prove a material issue in a case, it is not hearsay. Id. at 915. A recognized, non-hearsay use of an out of court statement is to “show motive.” Id.
Thus, a victim’s out of court statements were admitted to prove motive in the homicide case Blackwood v. State, 111 So.2d 399, 407 (Fla.2000). There, the Supreme Court considered a witness’s statements that relayed certain comments that the victim had made to the defendant— that the victim had “had abortions from [the defendant]” and that the victim was “pregnant from someone else.” Id. The Supreme Court held that the victim’s statements were not hearsay. Id. Rather,
the victim’s statements were offered to show the effect such statements had on [the defendant]. His state of mind and knowledge were relevant to show both his motive and intent in committing murder. Certainly, the [defendant’s] knowledge of the victim’s past abortions, pregnancy, and intention not to see him anymore were material to the issue whether appellant possessed a motive to kill the victim.

Id.

Similar to Blackwood, in the homicide case Foster v. State, the state introduced the victim’s out of court statements to the defendant about reporting an arson in a school auditorium to the campus police. The Supreme Court held that the statements were non-hearsay to “establish both knowledge and motive, rather than to establish the factual truth of the contents of the statements.” 778 So.2d at 915. The Court observed that the defendant had a “motive for killing [the victim] as soon as he found out about [the victim’s] promise to tell the authorities the next morning” about the arson. Id.; see also Koon v. State, 513 So.2d 1253, 1255 (Fla.1987) (holding that a magistrate’s statement to the defendant at a preliminary hearing was not hearsay because it was relevant to defendant’s formation of a motive to kill a prosecuting witness); United States v. Cruz, 805 F.2d 1464, 1478 (11th Cir.1986) (out of court statement not hearsay if offered “to show the effect it has on [the] hearer”); Stewart v. Henderson, 207 F.3d 374, 377 (7th Cir.2000) (out of court statements not hearsay where offered to demonstrate impact on listener’s state of mind).
As were the statements in Blackwood and Foster, the victim’s emails to appellant in this case were admissible to establish a motive for the homicide — the sudden deterioration of appellant’s intense relationship with the victim. The state offered the statements not for their truth, but to demonstrate their impact on appellant. Because appellant was the recipient of the victim’s emails, this case is distinguishable from the line of cases involving a victim’s statement to a third person expressing *1110 fear of a defendant. See Johnson v. State, 969 So.2d 938, 951 (Fla.2007); Thomas v. State, 993 So.2d 105, 109-10 (Fla. 1st DCA 2008). In such cases, the victim’s statement cannot have had an effect on the defendant who did not hear it, so it cannot be offered for a material, non-hearsay purpose.
Appellant’s second point involves the statements he gave to the police. Appellant gave two statements, extending over eight hours. These DVD interviews were published to the jury with the benefit of a 746 page transcript. The detectives who questioned appellant used a variety of interrogation techniques: they worked to develop a rapport with appellant, pointing out similarities in their beliefs and backgrounds; they closely observed appellant’s non-verbal reactions to questioning; they confronted appellant with facts in the case that pointed to his guilt; they developed themes about how and why the crime occurred to see if appellant would latch on to one of the themes and talk about the case;[1] they offered socially acceptable motives to appellant to see if he would choose one; they offered him opportunities to explain things in a way that would not indicate guilt, but which would require an acknowledgement that he had been lying about certain facts;[2] they encouraged appellant to refer to himself in the third person, as “Jimmy,” to distance appellant from the case so that he would be more comfortable talking about it; they appealed to his closeness with the victim’s family to help them solve the case and give the family closure. In spite of the detectives’ efforts, appellant steadfastly refused to acknowledge any involvement in the murder.
In the first interview, the detectives questioned appellant about his whereabouts the night of the murder, the nature of his relationship with the victim, discrepancies between his story and Stephane’s, the jewelry found in his car, his lack of emotion or surprise when learning of the victim’s death, how he had a key to the victim’s house, his willingness to submit to DNA testing, how he had “strong reservations” about the “trainer guy,” and the events that led to the deterioration of his relationship with the victim. They discussed voodoo, which appellant described as a “process” or “ritual” which causes the perpetrator to “come forward” to the family. They talked at length about the phone found in appellant’s car, which appellant claimed he had purchased online and which he maintained was not the victim’s. He insisted that the phone had been in his car for several weeks. The detectives *1111 wondered how the phone could maintain its electrical charge for that length of time, but appellant contended that it was possible.
Longer than the first interrogation, appellant’s second interview with the detectives occurred several weeks later. At the beginning of the statement, appellant said he remembered that his wife had cleaned out the car on the day before the murder, so that he could not have been responsible for the phone discovered in his car. He suggested that this fact made Adelyn or Stephane the prime suspects, because they had been in his car the morning the victim’s body was found. The police focused on the discrepancy between this story and appellant’s adamant story about the phone in the first interview. The detectives asked appellant about the closeness of his relationship with the victim. They presented appellant with various theories about what had happened. Appellant never admitted his involvement in the crime.
Appellant argues that the trial court erred in allowing the jury to hear, over defense objection, four statements by the interrogating detectives that indicated their belief as to appellant’s guilt or “theory as to what happened.” Located in different parts of the lengthy interrogation, these are the four statements:
Let me talk to a jury, a grand jury, a judge, and a state attorney and say, “Listen, I spoke with [Appellant]. It took a while. [Appellant] obviously knows he made a mistake.”
* * *
I’m a little fearful you’re gonna do something to yourself. You’re gonna hurt yourself. And I’m being serious. I’m being sincere.
[[Image here]]
If you were a jury member and that’s the way it was told to you, you would say, “That guy’s lying.” Right?
⅜ ⅜ *
You know why? Because you know it’s true, Jimmy. You drove down here— and I am not yelling. You drove down here to the City of Miramar because you didn’t have control. Where the hell is she? She’s going to be rude to me like that on the phone, in front of Stephane? I don’t think so. I am going to humiliate her at the house. She ain’t there. Now what, Jimmy? Are you going to humiliate her? Did you?
To the last question in the last quoted paragraph, appellant responded, “You are taking one situation and generalizing it.” The questioning then moved on to other matters.
Appellant contends that, when considered in light of other statements contained in the two interviews, these four excerpts amount to reversible error under Sparkman v. State, 902 So.2d 258 (Fla. 4th DCA 2005). Distinguishable from Sparkman, this case does not present the great danger of unfair prejudice that was the basis of that case’s holding.
Sparkman was a manslaughter case involving the death of a toddler. Id. at 254. Other than the defendant, there were no direct witnesses to the events leading up to the child’s death. See id. at 254-57. The case was based largely upon after-the-fact testimony from the child’s father, an emergency medical technician, and two medical examiners, one of whom testified that traumatic, and not accidental injury was the cause of the child’s death. Id. In a tape recorded statement with a detective, the defendant maintained that she did not do anything that would have hurt the baby, that she just shook her a little to get her to wake up from a seizure. Id. at 256-57. During the statement, the detective launched into an extensive recitation of his theory of the case, outlining his version of *1112 the facts of the crime. Id. at 257-58. The defendant responded to the detective’s accusations with “Uh huh” and with silence. Id.
We reversed based on the trial court’s failure to exclude the detective’s hypotheses about how the crime occurred from the tape recording. Id. at 258-59. The basis of the holding was that the probative value of the detective’s words was “substantially outweighed by the danger of unfair prejudice” or “misleading the jury” under section 90.403, Florida Statutes (2005).[3] See Shrader v. State, 962 So.2d 369, 371 (Fla. 4th DCA 2007) (recognizing that basis of holding in Sparkman was that detective’s statements were “blatantly prejudicial”). The danger of unfair prejudice in Sparkman was that the jury might have taken the defendant’s responses to the detective’s detailed and speculative narrative — silence and “Uh huh” — as admissions of guilt.
Not everything a detective says to a defendant during a recorded interrogation is unfairly prejudicial under 90.403. The Supreme Court has recognized that a jury may hear an interrogating detective’s statements about a crime when they provoke a relevant response from the defendant being questioned. For example, confronting a defendant with a codefendant’s statements may properly be used “as provocation” to observe a defendant’s reactions. See Jackson v. State, 18 So.3d 1016, 1031-32 (Fla.2009). Such statements may be heard by the jury to “give context to the interview.” McWatters v. State, 36 So.3d 613 (Fla.2010). When placed in “their proper context,” an interrogating detective’s statements to a suspect could be understood by a “rational jury” to be “techniques” used by law enforcement officers to secure confessions. Id. at 637 (quoting Worden v. State, 603 So.2d 581, 583 (Fla. 2d DCA 1992)).
This case does not present the danger of unfair prejudice that informed Sparkman. Appellant made no equivocal responses that the jury might have misconstrued. Throughout the eight hours of interrogation, an alert, articulate appellant maintained that he did not commit murder, no matter what interrogation technique the detectives threw at him. The jury had ample time to consider the defendant’s credibility over the course of the extensive questioning. When placed in the context of the entirety of the interrogation, the trial court did not abuse its discretion in admitting the four excerpts quoted above.[4]
*1113 We have considered the other issues raised by appellant and find no reversible error.
DAMOORGIAN and CIKLIN, JJ., concur.
DAMOORGIAN, J., did not participate in oral argument, but has had the opportunity to review the entire proceedings.

. For example, one detective told appellant: People do things for all different kinds of reasons. Love is a strong emotion. People have done crazy things for love. Not romantic love. Jealousy. Things happen. People make mistakes. Some you cannot reverse. But you can still do things to atone, to offer some relief to the family or whatever. Bad things happen.

. For example, in the middle of the interrogation, this exchange occurred:
Detective Smith: Last night, you may have gotten a call — you called Kathy [the victim], right? You had a spat on the phone or whatever. You went by the house, okay. And I know you — Jimmy goes by the house, okay? While she's out, he hangs out there after mom and dad go to sleep. Hangs outside the house. Kathy comes home. You confront Kathy, right? This is just a hypothetical. You confront her. You guys get in an argument. You take the phone last night. I am not saying you touched her. I am saying you took the phone last night because you did not want her to call the guy she was out with. But then, it’s our job to look at Benny or whoever, because they did whatever they did. What do you think of that hypothetical?
Appellant: Hypothetically, it would not add up. Because if I had a confrontation with her or argument with her, talking is not— she is not going to talk hush, hush.

. Although Sparkman v. State makes reference to the detective’s "hearsay statements,” the hearsay rule cannot have been the basis for the holding. 902 So.2d at 259. The opinion references the rule that a "trial court’s ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion.” Id. "[Hjearsay evidence is inadmissible” under section 90.802, Florida Statutes (2008), so its admission is not a discretionary ruling of a trial judge. On the other hand, whether evidence is admissible under section 90.403, Florida Statutes (2008), is a discretionary ruling of a trial court. See Sims v. Brown, 574 So.2d 131, 133 (Fla.1991) (where the court wrote that the "weighing of relevance versus prejudice or confusion is best performed by the trial judge who is present and best able to compare the two”); Citrus County v. McQuillin, 840 So.2d 343, 345 (Fla. 5th DCA 2003) (recognizing abuse of discretion standard of review for rulings on the admissibility of evidence).

. A trial judge’s application of section 90.403 to eliminate unfairly prejudicial statements is not a precise tool for addressing the problem of unfair prejudice. Given the wide discretion afforded to trial courts’ section 90.403 rulings, that section hardly eradicates prejudice with laser like precision. Faced with a defendant’s interrogation that contains non-hearsay statements by police officers, a trial court might also specially instruct the jury on the limited purpose for which the jury has been allowed to hear the interrogator’s state *1113 ments. See § 90.107, Fla. Stat. (2005). This is an example of such an instruction:
A recorded police interrogation of the defendant has been introduced into evidence in this trial. During the interrogation, any statements made by the police interrogator are not to be considered by you jurors as evidence of the defendant's guilt. The statements made by the police interrogator during the interview of the defendant have not been introduced into evidence to prove the truth of the matters asserted in those statements. In fact, the statements made by the police interrogator during the interrogation of the defendant may be false and misleading. It is permissible for a police officer conducting an interrogation of a defendant to make false and misleading statements to the defendant in order to further the aims of the interrogation. However, it is not permissible for you jurors to rely on such police interrogator’s statements as proof of the defendant’s guilt.