PER CURIAM.
Lesly Jean-Philippe was convicted of first-degree murder for the 2009 murder of his wife, Elkie Jean-Philippe, and of aggravated battery for his attack on his sister-in-law, Roya Gordon. On a unanimous jury recommendation, the trial court sentenced the defendant to death for the murder, after finding three aggravating factors. This is appellant Jean-Philippe’s direct appeal. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Having considered the issues presented in this case, we affirm the appellant’s convictions and sentences.
I. BACKGROUND
Appellant was charged in January 2010 with one count each of first-degree murder in the death of his wife, burglary of a dwelling, and aggravated battery with a deadly weapon on his sister-in-law. The trial court subsequently dismissed the burglary charge, and the case proceeded to jury trial on the remaining charges.
A. Guilt Phase
The evidence presented during the guilt phase of the 2011 trial showed that at the time of her death in August 2009, Elkie Jean-Philippe was twenty-four years old. She had been married to appellant for three years, and they lived with her five-year-old child — from a previous relationship — in an apartment in Jacksonville. Elkie served as a medic in the United States Navy, and appellant, who was twenty-three, had left the Navy and was enrolled in college. The couple was not happy, and their marriage had begun to fall apart.
On August 21, 2009, Elkie went to the hospital where she worked and — in an emotional discussion — told her supervisor, Joe Alonso, of her marital difficulties. On his recommendation, she went to a hospital social worker’s office for counseling. While she was there, appellant arrived at the counselor’s office and asked to see his wife. The counselor refused to let him in, but appellant persisted, testing her locked door. Security personnel soon arrived, and after a brief discussion, appellant left the area. He went to a clinic, where his stepson was waiting for his mother with Alonso. Appellant apparently told his stepson “goodbye” and left. Soon thereafter, appellant flew to his parents’ home in Rhode Island.
Appellant stayed with his parents until August 26. During that time, he frequently contacted his wife by calling and sending her text messages. He also was in *1075 telephone contact with Elkie’s younger sister, Roya Gordon, who was also in the Navy and was stationed in California. Gordon knew from speaking with her sister and with appellant that Elkie wanted a divorce and appellant did not. Gordon advised the unhappy appellant to stop pushing Elkie to reunite, telling him that his efforts only pushed Elkie away. Gordon also told him of her plans to visit her sister.
On August 26, 2009, Gordon flew from California to Jacksonville. Unbeknownst to Gordon and Elkie, appellant also flew to Jacksonville that day, arriving at about 7:15 p.m. During the course of the day, he sent several text messages and left at least one voice message on Gordon’s cell phone. He also called his wife’s cell phone more than sixty times and sent text messages in which he quoted Bible verses and asked to talk to her. When he landed in Jacksonville, he took a taxi to the apartment complex where he had lived with his wife and stepson. He arrived there before 8:30 p.m. The taxi driver testified that he overheard appellant raising his voice while talking on a cell phone and saying, “Wait a minute, we can work it out.”
Appellant had texted his wife earlier in the evening, and she had responded that she could not talk because she was on the way to the airport. Elkie and her son picked Gordon up from the airport at about 9:30 p.m. As they traveled to Elkie’s apartment, appellant called both his wife’s and Gordon’s phones repeatedly. The calls went mostly unanswered. Gordon answered one call and lied to appellant, telling him that she was still waiting for Elkie to pick her up at the airport. Then, upon their arrival at the apartment complex where Elkie and her son still lived, Gordon answered a call and told appellant that they had just arrived but that Elkie would not talk to him. Appellant immediately called her back, accusing her of having lied about their whereabouts shortly before. Gordon made a flip response and hung up. Then Elkie and the young child went into the apartment. Elkie put her son in the bathtub, and she and Gordon talked about the difficulties between Elkie and appellant.
Within an hour after Elkie and the others went into the apartment, appellant walked to his wife’s car and removed the car jack from it. Carrying the jack, he walked to the apartment door and knocked but did not identify himself. Instead, he pretended to be a delivery person and announced that their pizza had arrived. Because neither Gordon nor Elkie had ordered a pizza, Elkie asked Gordon to accompany her to the door. Gordon said that the situation did not “feel right.” As Elkie slowly opened the door, appellant barged inside and immediately hit Gordon on the head with the jack, lacerating her head and knocking off her glasses. Bleeding profusely, Gordon ran to the back of the apartment.
After hitting Gordon, appellant turned on his wife, hitting her with the jack, as evidenced by the blunt force trauma wounds she sustained. The attack continued as they moved into the kitchen. There, appellant abandoned the jack, and after arming himself with an accessible knife, he began stabbing Elkie repeatedly. Gordon heard her sister screaming and pleading with appellant, and Gordon attempted to call 911 for help. Unable to complete the call, however, Gordon fled the apartment through the front door. As she passed the kitchen, she saw her sister lying on the floor and appellant standing over her, his arms raised in the air. When Gordon stopped in the parking lot to call 911, her head was still bleeding, and she was highly emotional. Seeing this, a resi *1076 dent of the apartment complex approached and assisted her with the call.
Meanwhile, Elkie’s next-door neighbor heard the victim’s screams and pleas for help and the cries of Elkie’s son. She tried to stop the attack in various ways. For example, she banged on Elkie’s apartment door, claiming to be the police. This neighbor also threw a bottle through the back window of Elkie’s apartment in an effort to distract the attacker. She testified that Elkie’s screams continued for some fifteen minutes.
When law enforcement officers subsequently entered the apartment, they found Elkie’s screaming child in the hall bathroom and discovered Elkie lying on the kitchen floor. She was covered in blood, but she was conscious and repeatedly said, “Help me.” Appellant, who also appeared to be bleeding, was found lying on the floor on the other side of the counter. When the emergency medical technicians arrived at the apartment, Elkie was still conscious and responsive, although she was bleeding profusely from the numerous wounds to her body. She remained conscious during the twenty-minute ambulance ride to the hospital and died there shortly after her arrival.
Dr. Jesse Giles, the forensic pathologist who performed the autopsy, testified that the victim was in shock and ultimately bled to death as a result of the numerous stab wounds. Specifically, she had fifty-two or fifty-three stab wounds and suffered injuries to her ear, lip, head, neck, nose, arms, fingers, shoulder, back, chest, breast, and abdomen. The pathologist testified that each of seven or eight of the stab wounds alone could have been fatal. This included penetrating wounds to the victim’s lung, liver, and stomach. In addition, the victim had defensive wounds to her arms and hands and had suffered several blunt force injuries. Because of the nature of the victim’s wounds, death was not instantaneous. She felt pain, was conscious, and could still talk, move, and fight her attacker throughout the assault.
After the State rested its case, appellant did not put on a defense. The jury returned a verdict of guilty on the charges of first-degree murder and aggravated battery with a deadly weapon. Upon appellant’s motion, the trial court had previously dismissed the armed burglary charge.
B. Penalty Phase and Sentencing
During the penalty phase, the State presented two witnesses with information about appellant’s aggressive behavior toward his wife. First, Angela Hill, a social worker at the naval hospital, testified regarding her discussion with a distraught Elkie at the hospital on August 21, 2009. Elkie told Hill that she wanted to leave appellant because he was controlling and that he had held her at knife-point and cut her hair the previous night. Next, a police officer from Virginia Beach, Virginia, testified regarding a domestic disturbance call to which he responded in July 2009. When the officer arrived at the hotel, appellant was angry and would not let his wife leave the room. He also refused to return her military identification and cell phone to her. Appellant told the officer that he suspected his wife was seeing someone else, and when the officer requested that appellant return the cell phone, he smashed it instead. Elkie then took her son and returned to the barracks. In addition, the victim’s mother, sister, and two friends gave victim impact statements.
Appellant declined to testify during the penalty phase, but a number of witnesses, including relatives, friends, ministers, and his college’s registrar, provided mitigating testimony. In rebuttal, the State presented a special agent of the Naval Criminal Investigative Service, who testified regarding appellant’s naval records. These rec *1077 ords included various incidents of misconduct that resulted in his reduction in rank. On cross-examination, however, the agent testified that appellant also received a commendation and positive evaluations that contributed to his promotions in rank.
The jury unanimously recommended a sentence of death. At the ensuing Spencer hearing, the defendant offered evidence regarding an incident for which he was admitted for psychiatric evaluation. See Spencer v. State, 615 So.2d 688, 690-91 (Fla.1993) (requiring a hearing for presentation of additional evidence after jury recommends sentence). Appellant again declined to testify.
On June 2, 2011, the circuit court sentenced appellant to death upon finding the following three aggravating circumstances and ascribing each great weight: (1) appellant had a prior violent felony conviction based on the aggravated battery of Roya Gordon; (2) the murder was especially heinous, atrocious, or cruel (HAC); and (3) the murder was cold, calculated, and premeditated (CCP). See § 921.141(5), Fla. Stat. (2009). In mitigation, the trial court found the statutory mitigator of no significant history of criminal activity, giving it some weight, but rejected the statutory age mitigator. See § 921.141(6), Fla. Stat. (2009). The court also found the following nonstatutory mitigating factors and ascribed them the weights indicated: (1) defendant was born in St. Martin and moved to the United States as a child (little weight); (2) defendant was a good student, attended college, and wanted to be a doctor (little weight); (3) defendant was physically talented, excelling in football and track (little weight); (4) defendant’s father was strict and restricted his activities with friends and girls (no weight); (5) defendant was a good son, brother, and friend who helped others (some weight); (6) defendant’s family is very close (some weight); (7) defendant was raised in a Christian home, attended church regularly, and participated in a church youth program (some weight); (8) defendant has the love and support of his family, friends, and church (little weight); (9) defendant served in the United States Navy (some weight); (10) defendant was adopting the victim’s son (no weight); (11) defendant’s judgment was impaired (slight weight); (12) defendant showed remorse and accepted responsibility (little weight); (13) defendant’s courtroom demeanor was excellent (no weight); and (14) defendant can contribute to the improvement of other prisoners (slight weight). The trial court found the circumstance that appellant had a girlfriend who he took to the prom in high school was not established. Finally, the trial court determined several proposed circumstances — such as the motto of appellant’s home state of Rhode Island is “Hope” — did not constitute mitigation under Florida law.
After considering and weighing the aggravating and mitigating factors and the jury’s recommendation in the case, the trial court concluded that death was the appropriate penalty. On July 2, 2011, the court sentenced appellant to death for the first-degree murder of Elkie Jean-Philippe and imposed a fifteen-year sentence for the conviction of aggravated battery with a deadly weapon on Roya Gordon.
II. ANALYSIS
On appeal from his conviction for first-degree murder and sentence of death, Jean-Philippe raised the following claims: (1) whether the trial court erred in admitting evidence of text messages sent from appellant’s cell phone to his sister-in-law and to his wife; (2) whether the trial court erred in finding that the murder was CCP; (3) whether the trial court erred in giving great weight to the finding that the mur *1078 der was HAC; (4) whether the sentence of death is proportionate; and (5) whether Florida’s capital sentencing scheme violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Below, we address these issues in turn and then independently review the record to determine whether competent, substantial evidence supports the verdict.
A. Admission of Text Messages
At trial, two different kinds of phone records were admitted into evidence: the phone company call logs of appellant’s cell phone and the text messages downloaded from the phone by law enforcement officers. The phone company’s records of calls made from and to appellant’s cell phone during the pertinent period of time were admitted under a business records exception to the hearsay rule. See §§ 90.803(6), .902(11), Fla. Stat. (2009). Although appellant objected to the admission of the call logs into evidence in the trial court, in this appeal he does not raise any error regarding their admission into evidence. With regard to the text messages, however, appellant claims that they were inadmissible. We first recount the evidence presented at trial regarding both the call logs and the text messages and then address appellant’s claims of error regarding the admission of the text messages. In determining whether the trial court erred, we apply the standard that the “[a]dmissibility of evidence is within the sound discretion of the trial court, and the trial court’s ruling will not be reversed unless there has been a clear abuse of that discretion.” Jones v. State, 963 So.2d 180, 185 (Fla.2007).
At trial, the cab driver who drove appellant from the Jacksonville airport to the apartment complex on the evening of August 26, 2009, testified. He overheard appellant talking on a cell phone and then raising his voice as he said, “Wait a minute, we can work it out.” The evidence established that a cell phone was recovered from appellant’s pocket at the crime scene. The phone company call records admitted at trial listed appellant as owner of that phone and listed a number of calls from appellant’s phone to the phone numbers of Elkie and her sister. In fact, there were repeated calls from appellant’s phone to the sisters’ phones on the day of the murder, including more than sixty calls to Elkie’s alone. In addition, these call records showed that as appellant traveled from Rhode Island to Jacksonville on the day of the murder, his phone did too. The records reflected that the phone’s servicing areas changed from Rhode Island to Washington, D.C., and finally to Jacksonville. Moreover, Gordon’s testimony corroborated this evidence. She testified that she and appellant communicated through their cell phones during the period that he was in Rhode Island and particularly on the day of the murder. On August 26, they used their cell phones to speak to each other by phone, to leave recorded messages, and to send and receive text messages. For example, Gordon told the jury that soon after she arrived in Jacksonville, she spoke to appellant when he called and that after Elkie picked her up, appellant called both of their phones repeatedly. Gordon further testified that before answering her phone upon arrival at Elkie’s apartment complex, Gordon recognized that appellant was calling, and when she answered, she spoke to appellant.
The text messages admitted at trial included exchanges between appellant and others on his phone’s contact list, including Elkie and Gordon, during the period from August 21, when Elkie sought counseling at the hospital, through August 26, the day of the murder. For example, on August 23, appellant sent a message asking Elkie to *1079 call him because he “realized some things” and wanted to talk. The next day, he responded to a friend’s text, stating a plan to call Elkie that evening and noting that Elkie’s mother favored a divorce. On August 25, he sent Elkie a text containing a Bible verse. The next day — the day of the murder — appellant called Elkie’s phone repeatedly and sent her several text messages. He sent her a Bible verse and later asked Elkie to call him during her lunch hour. In a text to Gordon, he asked that Gordon contact him. Still later on the day of the murder, he exchanged text messages with his wife as follows:
[Elkie:] My phone is going to die so stop calling[.]
[Appellant:] Just talk to me please[.]
[Appellant:] If we’re gonna get a divorce then fine, whatever but I don’t want this to end with you hating me[.]
[Appellant:] You told me to go to hell and told me fuck you, seriously how am I supposed to react to that. I know what I did was fucked up but I just wanna talk, seeing you the way you are now I’ll listen to reason and I won’t push the issue of us anymore[.]
[Elkie:] I only have 15% of battery left. Stop calling[.]
[Appellant:] Talk to me please[.]
[Elkie:] Later[.]
[Appellant:] Jus [sic] pick up and hear me out please, if you just jus [sic] talk to me I won’t keep callingf.]
Later that day, Elkie texted appellant, again telling him that she would talk to him later and stating that she was on the way to the airport.
With regard to the admission of the text messages, appellant first claims that they were erroneously admitted under the statutory business records provisions. Contrary to appellant’s contention, however, the text messages — unlike the call records — were not admitted as self-authenticating business records under those statutes. Accordingly, appellant’s reliance on cases such as Brooks v. State, 918 So.2d 181(Fla.2005), receded from, on other grounds by State v. Sturdivant, 94 So.3d 434 (Fla.2012), to support this claim is misplaced.
Appellant next contends that the text messages constituted inadmissible hearsay. By statutory definition, “ ‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” § 90.801(l)(c), Fla. Stat. (2009).
A statement may, however, be offered to prove a variety of things besides its truth. See Williams v. State, 338 So.2d 251 (Fla. 3d DCA 1976) (“Merely because a statement would not be admissible for one purpose (i.e., its truth or falsity) does not mean it is not admissible for another (e.g., to show the declar-ant’s state of mind.”)). A statement may be offered, for instance, to show motive, knowledge, or identity. Of course, the alternative purpose for which the statement is offered must relate to a material issue in the case and its probative value must not be substantially outweighed by its prejudicial effect.
Foster v. State, 778 So.2d 906, 914-15 (Fla.2000) (some citations omitted). Thus, a text message may be hearsay, but only if offered for the truth of the matter asserted. This principle is amply demonstrated in Bowe v. State, 785 So.2d 531 (Fla. 4th DCA 2001).
In Bowe, an informant sent a message to the defendant’s pager using a phone at the sheriffs office. 785 So.2d at 531-32. The text message that was sent consisted of the sheriffs office phone number and the number 40, indicating that the informant wanted to pay forty dollars for four co- *1080 came rocks. Soon thereafter, Bowe called the phone number, and the caller ID on the sheriffs phone displayed Bowe’s name. The informant answered the phone and set up the buy. When Bowe was subsequently arrested, authorities found his pager, and its readout displayed the information sent by the informant. On appeal, the court rejected the defendant’s contention that the “informant’s numerical communication to the pager” was hearsay.
If this statement had been offered to “prove the truth of the matter asserted” — that the informant wanted to purchase four cocaine rocks for $40 — then the statement would have been hearsay. See § 90.801(l)(c), Fla. Stat. (2000). However, the prosecution offered the “statement” not to prove the truth of the matter asserted, but to show that the recipient of the numerical message was the defendant, since the numbers appeared on his pager.
785 So.2d at 532-33. In addition, with regard to the display of the defendant’s identification information on the sheriffs caller ID, the court found “there was no message transmitted that fell within the definition of hearsay.” Id. at 533.
In the instant case, as in Bowe, most of the text messages from appellant’s phone were not hearsay because they were not offered to prove the truth of the matter asserted therein. See Foster, 778 So.2d at 915. They were admitted to show the course of appellant’s conduct and were relevant to appellant’s motive for killing his wife. Moreover, in the' text messages to Elide, both during the week they were apart and on the day of the murder, he pleaded with her to return his calls. His frustration at being unable to control the situation apparently heightened over time. His repeated calls to Elkie’s phone went unanswered on the day of the murder, and she rebuffed him each time he texted her. What was not in the texts was equally relevant. Although appellant communicated with Gordon regarding her plans to travel to Jacksonville, he never told her of his own travel plans for that day. And despite multiple texts to both, he never told Gordon or his wife that he was in Jacksonville and, in fact, waiting at the apartment complex the night of the murder. Finally, some of appellant’s statements in the text messages were admissible under section 90.803(18)(a), Florida Statutes (2009), which provides that regardless of the availability of the declar-ant, “[a] statement that is offered against a party and is ... [t]he party’s own statement” is admissible. Thus, for example, appellant’s text message to a friend stating that he was aware that Elide wanted a divorce and that he was concerned that her mother was encouraging that decision, would be admissible under this statute. Accordingly, the trial court did not abuse its discretion by admitting the text messages.
Appellant next argues that admission of the text messages violates the Supreme Court’s holding in Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), that the Confrontation Clause of the Sixth Amendment bars the admission of a witness’s testimonial statements unless the witness was unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. See Davis v. Washington, 547 U.S. 813, 821,126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (“It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.”). We have already concluded that the text messages in this case did not constitute hearsay or were admissions; accordingly, there is no Crawford violation.
*1081 B. The CCP Aggravator
Appellant contends that the trial court erred in finding that the CCP aggra-vator applied in this case. Previously, we have explained the standard of review applicable to aggravating circumstances as follows:
“When reviewing a trial court’s finding of an aggravator, ‘it is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job.’ ” Aguirre-Jarquin v. State, 9 So.3d 593, 608 (Fla.2009) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)), cert. denied, [559 U.S. 942], 130 S.Ct. 1505, 176 L.Ed.2d 118 (2010). Rather, it is this Court’s task on appeal “to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.” Id. (quoting Willacy, 696 So.2d at 695).
Williams v. State, 37 So.3d 187, 195 (Fla.2010). For the CCP aggravator to apply in a case, the following four factors must be established.
(1) the killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.
Lynch v. State, 841 So.2d 362, 371 (Fla.2003). In this case, appellant specifically argues that the evidence does not support the trial court’s finding that the murder was cold and calculated. We disagree.
Appellant acknowledges that this Court has rejected evidence of a troubled domestic relationship as a per se mitigating factor. See Lynch, 841 So.2d at 377 (“This Court does not recognize a domestic dispute exception in connection with death penalty analysis.”). Nevertheless, he relies on our decision in Santos v. State, 591 So.2d 160 (Fla.1991), to argue that the inflamed passions of the domestic dispute with his wife essentially negate both coldness and calculation in this murder. Our rejection of CCP in Santos, however, was “based on a mental health expert’s testimony, that the ‘ongoing, highly emotional domestic dispute’ had ‘severely deranged’ Santos and that he was under extreme emotional distress and unable to appreciate the criminality of his conduct” at the time of the murders. Allred v. State, 55 So.3d 1267, 1279 (Fla.2010) (quoting Santos, 591 So.2d at 163), cert. denied, — U.S. -, 132 S.Ct. 181, 181 L.Ed.2d 91 (2011). In contrast, these mitigating factors are not present in this case. As the trial court found, although the “incident [in this case] is domestic in nature, ... it is not a case of a frenzied murder born of passion after a spontaneous, unexpected argument.” State v. Jean-Philippe, No. 16-2009-CF-11429-AXXX-MA (Fla. 4th Cir. Ct. Sentencing Order filed June 2, 2011) at 15.
Appellant flew to Jacksonville, telling no one of his travel plans. He went immediately to the apartment complex where he and his wife had lived. He waited there for some time, knowing that his wife was picking up her sister at the airport. Upon their arrival, he called and briefly spoke to his sister-in-law, and then he waited some time before he armed himself with the car jack and used trickery to gain entry. Thus, although appellant contends that he went to the door to “discuss their relationship,” the evidence belies this claim. Appellant’s Initial Brief at 41. Immediately *1082 upon gaining entry, appellant attacked his sister-in-law and then turned on his wife. Contrary to appellant’s claim, the fact that appellant found the jack an unwieldy weapon and discarded it in favor of a knife in his kitchen does not negate his prior procurement of a weapon. He then used the knife to stab his wife at least fifty-two times during the ensuing quarter of an hour.
Appellant also claims that the coldness factor is negated by circumstantial evidence that he intended to kill his wife and then commit suicide. He cites the evidence that law enforcement officers found him lying face down and bleeding at the scene. Two knives lay nearby, and he was bleeding from wounds to his neck. We find that appellant’s reliance on this Court’s decision in Hardy v. State, 716 So.2d 761 (Fla.1998), to support his claim is misplaced. In that case, an armed defendant shot and killed an officer who was about to pat him down. Soon after fleeing the scene, Hardy shot himself in a failed suicide attempt. Hardy, 716 So.2d at 762. We rejected the finding of CCP in that case because Hardy’s decision to shoot the officer was “spur-of-the-moment” and then noted that Hardy’s suicide attempt was “not an action characteristic of someone who reflected on his decision to extinguish the life of another.” Id. at 766. That is, shooting the officer more likely stemmed from the defendant’s panic than it did from “calm and cool reflection.” Id. As explained above, the facts in the instant case in no way suggest that appellant’s decision to kill his wife was “spur-of-the-moment,” and any suicide attempt by appellant does not negate the CCP aggravator in this case.
Finally, we reject appellant’s claim that his failure to plan for the aftermath of the murder indicates that the murder was not calculated. Such evidence is not a requirement to establish the CCP aggravator. Moreover, if as appellant contends, he intended to commit suicide after killing his wife, he necessarily had a plan for the aftermath.
Accordingly, we conclude that competent, substantial evidence supports the finding of the CCP aggravator in this case.
C. The HAC Aggravator
As stated above, the trial court found that the murder was heinous, atrocious, or cruel, and ascribed the HAC ag-gravator great weight. In this appeal, appellant does not dispute the HAC finding. Instead, he contends that the trial court erred in giving the aggravator great weight. However, “[o]nce a trial court finds that an aggravating circumstance has been established beyond a reasonable doubt, the weight to be given ‘is within the discretion of the trial court, and it is subject to the abuse of discretion standard.’ ” Bright v. State, 90 So.3d 249, 261 (Fla.) (quoting Buzia v. State, 926 So.2d 1203, 1216 (Fla.2006)), cert. denied, - U.S. -, 133 S.Ct. 300, 184 L.Ed.2d 177 (2012).
Appellant argues that his attack on his wife illustrates his “loss of control” and diminishes the weight of the HAC aggravator. Appellant’s Initial Brief at 13. He mistakenly focuses on his own perspective and actions as determinative of this issue. With regard to the HAC aggravator, “ ‘the focus should be upon the victim’s perceptions of the circumstances as opposed to those of the perpetrator’ ” and the “evidence must show that the victim was conscious and aware of impending death.” Pham v. State, 70 So.3d 485, 497 (Fla.2011) (quoting Lynch v. State, 841 So.2d 362, 372 (Fla.2003)), cert. denied, — U.S. -, 132 S.Ct. 1752, 182 L.Ed.2d 541 (2012). In this case, appellant used a ruse to catch his wife off guard and attacked *1083 her over an extended period — repeatedly stabbing her while she screamed, begged, and fought for her life. She was aware and conscious throughout the attack. Moreover, although bleeding profusely, she was conscious when the paramedics arrived, and in the ambulance, she struggled to breathe on the way to the hospital, where she died soon after her arrival. Accordingly, we conclude that appellant has not demonstrated that the trial court abused its discretion in giving the HAC aggravator great weight in this case. See Pham, 70 So.3d at 491 n. 2, 497 (affirming HAC aggravator given great weight where victim received six stab wounds, suffered high degree of pain and defensive wounds, and daughter was present); Banks v. State, 46 So.3d 989, 1000 (Fla.2010) (affirming very great weight given HAC ag-gravator where victim received fourteen stab wounds, was conscious throughout the attack, and bled to death), cert. denied, — U.S. -, 131 S.Ct. 1689, 179 L.Ed.2d 627 (2011).
D. Death Sentence Proportionality
In each case in which a death sentence is imposed, this Court conducts a proportionality review in which we consider the totality of the circumstances in the case and compare it with similar capital cases to determine whether the capital case falls within the category of one of the most aggravated and least mitigated first-degree murders warranting a death sentence. See Lebron v. State, 982 So.2d 649, 668 (Fla.2008). This is a qualitative, rather than a quantitative, review. Thus, the Court does not merely compare the number of aggravating and mitigating circumstances. See Gill v. State, 14 So.3d 946, 963-64 (Fla.2009). In this case, the jury unanimously recommended death, and in imposing that sentence, the trial court found three aggravators — HAC, CCP, and prior violent felony conviction — and assigned each great weight. Each of these is among the most serious of the aggrava-tors. See Jackson v. State, 18 So.3d 1016, 1035 (Fla.2009); Chamberlain v. State, 881 So.2d 1087, 1108-09 (Fla.2004). With regard to mitigation, the trial court found one statutory mitigator — no significant history of criminal activity — and thirteen non-statutory mitigating factors and assigned slight to some weight to each.
Accordingly, we hold that under the totality of the circumstances, the sentence in this case is proportional in relation to similar cases in which we have affirmed death sentences. See Pham, 70 So.3d at 500-01 (holding death sentence proportionate where jury recommended death by ten-to-two vote for stabbing murder for which trial court found four aggra-vators — prior violent felony conviction, HAC, CCP, and committed in the course of a burglary/kidnapping — and the following mitigation — under influence of mental or emotional disturbance, somewhat impaired capacity to appreciate criminality or conform to requirements of law, traumatic childhood, and stable employment history); Banks, 46 So.3d at 1000 (holding death sentence proportionate for stabbing murder where jury recommended death by ten-to-two vote and trial court found HAC, CCP, and prior violent felony conviction aggravators, and five mitigating factors— low IQ, brain deficit, antisocial personality traits, not the only participant, and difficult youth); and Buzia, 926 So.2d at 1216-17 (holding death sentence proportionate where trial court found prior violent felony, HAC, CCP, and avoid arrest aggrava-tors, no statutory mitigators, and nonstatu-tory mitigators that included non-extreme mental or emotional disturbance, somewhat impaired capacity to appreciate criminality of conduct, gainful employment, appropriate courtroom behavior, difficult *1084 childhood, cooperation with law enforcement, and remorse).
E. Ring Issue
Appellant argues that this Court’s decisions in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), concluding that the Supreme Court’s decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), does not invalidate Florida’s death penalty scheme, were wrongly decided. We have “repeatedly rejected constitutional challenges to Florida’s death penalty under Ring.” Ault v. State, 53 So.3d 175, 206 (Fla.2010), cert. denied, — U.S. -, 132 S.Ct. 224, 181 L.Ed.2d 124 (2011). Moreover, in this case, one of the aggravating factors is a prior violent felony conviction based on the jury finding appellant guilty as charged for the aggravated battery on his sister-in-law. See Frances v. State, 970 So.2d 806, 822 (Fla.2007) (“This Court has repeatedly relied on the presence of the prior violent felony aggravating circumstance in denying Ring claims.”). In addition, the jury unanimously recommended the death sentence, and this Court has previously rejected Ring claims in cases involving unanimous jury recommendations of death. See Crain v. State, 894 So.2d 59, 78 (Fla.2004). Accordingly, we reject appellant’s claim.
F. Competent, Substantial Evidence
Although appellant did not challenge the sufficiency of the evidence supporting the verdict, this Court independently reviews the record in all death penalty cases to determine whether competent, substantial evidence supports the conviction. Pham, 70 So.3d at 501. “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001); see Simpson v. State, 3 So.3d 1135, 1147 (Fla.2009) (applying competent, substantial evidence standard to determine sufficiency of the evidence).
In this case, appellant was indicted for the first-degree, premeditated murder of his wife. “Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.” Asay v. State, 580 So.2d 610, 612 (Fla.1991). The evidence shows that on the day of the murder, appellant flew to Jacksonville, waited outside his marital home for his wife to return, obtained a weapon, and employed a ruse to gain entry into the apartment. He then beat and repeatedly stabbed his wife, injuring her head, lung, breast, back, arms, and other parts of her body over an extended period of time as she screamed and pleaded for help. See Miller v. State, 42 So.3d 204, 228 (Fla.2010) (noting the location of wounds and force used in stabbings constituted competent, substantial evidence supporting premeditation), cert. denied, — U.S. -, 131 S.Ct. 935, 178 L.Ed.2d 776 (2011). In light of this evidence, we hold that competent, substantial evidence supports the jury’s finding of first-degree murder beyond a reasonable doubt.
III. CONCLUSION
Having reviewed the issues raised, including the sufficiency of the evidence and the proportionality of the sentence, we affirm appellant’s convictions and sentences.
It is so ordered.
*1085 POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.