Damoorgian, J.
Thomas Byrd appeals his conviction and sentence for one count of first degree murder and one count of armed robbery. On appeal, Appellant argues that the trial court reversibly erred by: (1) allowing the *661 State to introduce a co-defendant’s recorded statement to rebut Appellant’s alibi witness; (2) admitting certain cell-phone records into evidence; and (3) prohibiting the defense from cross examining the State’s crime scene technician about the results of a presumptive gun-shot residue test performed on a co-defendant. We affirm on issues 2 and 3 without further comment. We reverse on issue 1 and remand for a new trial.
Appellant, along with two other men, Kevin Sammiel and Sherman Colson, were charged with the robbery and murder of Dustin Deckard (the “Victim”). The evidence established the Victim was shot and killed while walking to a friend’s home shortly after 12:30 a.m. Surveillance video from a nearby house depicted the Victim walking by while talking on his cell-phone at 12:31 a.m. About a minute later, the tape caught a light colored mini-van slowly driving by. Shortly thereafter, a witness saw two men struggling with the Victim, and noticed a “beat-up” “grayish-green” minivan idling nearby. At first, the witness assumed that the van was stopping to call the police, but then saw the two men run towards the van, get in the passenger-sliding door, and watched the van speed away in a northbound direction. The witness called 911 at 12:38 a.m. and the police immediately put out a BOLO for the van. Around the same time, another witness called the police anonymously and reported that there was a dead body lying on the sidewalk.
The first officer to respond to the BOLO reported seeing what appeared to be a gold colored minivan with damage on the driver’s side about three blocks north-east of the shooting at 12:40 a.m. At 12:48, an officer a few miles north spotted a van matching the BOLO description. That officer pursued the van and, as soon as he turned on his overhead lights, a passenger (who turned out to be Appellant) jumped out of the van. The driver (Colson) pulled over and police arrested him and the remaining passenger, Sammiel. Appellant was quickly apprehended with the assistance of a K9 unit. Law enforcement recovered the Victim’s cell-phone from inside the van. The murder weapon was never found.
Upon being arrested, Appellant refused to speak with the police. Colson, on the other hand, admitted to his role in the murder and identified Appellant as, the shooter. Sammiel spoke with police, but denied any involvement in the robbery and shooting, claiming that an unspecified “they” came and picked him up from his aunt’s house presumably after the shooting.
Relevant to the issue on appeal is Appellant’s pretrial motion to sever his case from his two co-defendants’ cases because both co-defendants gave statements to police implicating Appellant in the murder. In response to Appellant’s motion to sever, the State agreed that both Colson and Sammiel made statements to the police which would constitute inadmissible hearsay if used against Appellant. The State also acknowledged that it intended to offer Colson’s statement into evidence and, therefore, agreed that Colson’s case should be severed. However, the State informed the court that it did not intend to use Sammiel’s statement and, therefore, maintained that Appellant and Sammiel should be tried together. Based on the State’s representations, the court granted Appellant’s motion to sever as it pertained to Colson but denied it as it pertained to Sammiel.
Shortly before trial, both Appellant and Sammiel filed a notice of intent to call their aunt as an alibi witness. In response, the State notified the court that it wished to introduce Sammiel’s statement to rebut *662 the' aunt’s statement that both Appellant and Sammiel were at her house at the time of the murder. Based on the State’s notice, Appellant renewed his motion to sever, arguing that Sammiel’s statement constituted inadmissible hearsay as it pertained to Appellant and' if introduced, would violate Appellant’s Sixth Amendment Confrontation Clause rights. The court denied Appellant’s motion and Appellant and Sammiel were tried together.
At trial, both Appellant and Sammiel argued that they were not in the van at the time of the shooting and were instead at their aunt’s house. In support of this position, they presented testimony from a private investigator, who testified, that the aunt’s house was only a minute away from the location where the van was spotted before it was ultimately stopped. They also called their aunt as a witness. She testified that on the night of the murder, Appellant, Sammiel, and Colson came to her house around 8 p.m. and the four proceeded to drink and smoke marijuana' together. At around 11:45 p.m., they ran out of drugs and alcohol and sent Colson out to get more. According to the aunt, Colson pulled back up in front of her house after 12:30 a.m., “jumped out,” gave the aunt back the money she had given him to buy drugs and alcohol, and told Appellant arid Sammiel to get in the van. The three men then left. On cross-exam, the aunt admitted that she waited more than two years to tell anyone about her nephews’ purported alibi.
To rebut the aunt’s testimony, the State introduced an excerpt from Sammiel’s recorded statement to the police. In that statement, the interviewing detectives confronted Sammiel with the .911 caller’s recount and in response, Sammiel stated “what that got to do with me?' I just told you, they came and they picked me up from my auntie’s house.”
During its closing, the State' emphasized the unbelievable nature of the aunt’s alibi testimony, arguing:
Now the timeframe is important because it’s not just that Sherman Colson would have gotten to drive all the way back to [the aunt’s house], and then tell the two to get in the car ... if there’s two other men, two other men that did this, not only does Sherman Colson have to drive back, but somewhere along the way, let these other two guys out of the van, because we don’t see or hear from them again. And then while fleeing the scene, decide I’m going to stop by, and pick up Mr. Byrd and Mr. Sammiel. ...
So not only does the van come back, take a round about through 13th Ave, but Sherman Colson, while in flight, away from a murder that he just committed with two random, never seen from again, black males, picks up these two other individuals, who are not involved, round abouts, and does it in approximately 3 minutes, it doesn’t make sense. If it doesn’t make sense, it’s inconsistent. It’s inconsistent because it lacks credibility. Her tale lacks' credibility-
And what does one base their conviction on? Credibility. Consistency, and the truth. The truth doesn’t waver, the truth endures. Because after two. years— again, she’s had time to think about this, But she still gets her statement wrong. She comes in and said, Mr. Sammiel and Mr. Byrd, these two Defendants, they were with me, Colson went alone.
.Mr.- Sammiel says something quite different, and the devil is in the details. Mr. Sammiel says ‘they came and picked me up, they went without me. I was at "my auntie’s house.’ And that’s a subtle difference that is so important; because it shows that those two stories, they *663 don’t match up, they’re inconsistent. Again, the inconsistencies in the alibi,
The jury found Appellant guilty of both counts as charged. This appeal follows.
Appellant argues that Sammiel’s recorded statement to police constituted inadmissible hearsay and its introduction at Appellant’s trial to impeach Appellant’s alibi witness was improper and violated Appellant’s Confrontation Clause rights. The State counters that as used at trial, Sammiel’s statement was not hearsay as it was not being used to prove the truth of the matter asserted—namely that Sammiel was not present when the Victim was shot and robbed—but was instead being used to impeach an alibi witness. In this capacity, the State maintains that the introduction of Sammiel’s statement was proper and did not violate Appellant’s Confrontation Clause rights. We hold that the statement was not admitted as hearsay and also note that when properly introduced as non-hearsay impeachment evidence, a co-defendant’s statement does not violate the defendant’s Confrontation' Clause rights. However, in this case, Sammiel’s statement was not proper impeachment evidence. Therefore, we reverse.
"hARSAY" deis defined as “a statement, other than one made by the declar-ant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” § 90.801(1)(c), Fla. Stat. (2014). “ ‘A statement may, however, be offered to prove a variety of things besides its truth.’ ” Jean-Philippe v. State, 123 So.3d 1071, 1079 (Fla. 2013) (quoting Foster v. State, 778 So.2d 906, 914 (Fla. 2000)). As such, a statement which constitutes inadmissible hearsay if used as substantive evidence of its truth can still be admissible for an alternative purpose, such as impeachment. Dias v. State, 812 So.2d 487, 495 (Fla. 4th DCA 2002).
Here,’ Sammiel’s statement to the effect of. “they came and picked me up” was not being used to prove the truth of the matter asserted. Indeed, Sammiel’s statement, if true, exonerated Sammiel as it established he vyas not in the van at the time the Victim was robbed and shot. Clearly, the State was not trying to prove the truth of Sammiel’s statement as it was prosecuting Sammiel for the Victim’s murder. Rather, as highlighted by the prosecutor' during closing, Sammiefs statemént established that no one—not the aunt nor Sammiel—was telling, the' truth about Sammiel and Appellant’s whereabouts at the time of the murder. In this context, Sammiel’s statement was admitted for the non-hearsay purpose of impeaching the aunt. As such, the statement also did not invoke the protections of the Confrontation Clause. Calloway v. State, 210 So.3d 1160, 1188 (Fla. 2017) (noting that “[a] codefen-dant’s incriminating statements that are 'admitted for nonhearsáy purposes, such as impeachment, do not invoke the protections of the Confrontation Clause”).
Although Sammiel’s. statement was not hearsay, under the facts of the case, it was also not proper impeachment evidence. “In Florida, a witness may not be impeached by any means not recognized in the Evidence Code.” Pantoja v. State, 990 So.2d 626, 629 (Fla. 1st DCA 2008). Florida’s evidence code provides the following complete list of. the ways .in which a party may .impeach a witness:
(1) Introducing statements of the witness which. are inconsistent with the witness’s present testimony.
(2) Showing that the witness is biased.
(3) Attacking the character of the witness in accordance with the provisions of s. 90.609 or s. 90.610,
(4)- Showing a defect of capacity, ability, or opportunity in the witness to *664 observe, remember, or recount the matters about which the witness testified.
(5) Proof by other witnesses that material facts are not as testified to by the witness being impeached.
§ 90.608, Fla. Stat. (2014).
Our reading of section 90.608 leads us to conclude that the impeachment evidence in this case does not fall into any of the' categories by which a witness’ credibility may be attacked. The only provision which is remotely applicable, “proof by other witnesses that material facts are not as testified to by the witness being impeached,” does not permit Sammiel’s statement to impeach the aunt because Sammiel was not a witness. Accordingly, we hold that while Sammiel’s statement is not hearsay and its introduction would not violate the Confrontation Clause, the introduction of the statement to impeach the aunt was nonetheless improper under section 90.608 of the Florida Statutes.
Having concluded that Sammiel’s statement was not proper impeachment evidence, we next consider whether its introduction was harmless. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986). Appellant argues that Sammiel’s statement implicated Appellant in the murder because it suggested that Appellant was one of the “they” that picked up Sammiel from the aunt’s house. Therefore, the jury may have convicted Appellant in part because of Sammiel’s statement. The State counters that the eye witness’ testimony was so compelling that Appellant would have been convicted in any event. The State also argues that the aunt’s testimony was incredible, suggesting that no reasonable juror would have believed the alibi. While it is worth noting that the alibi witness waited two years to come forward with her story and provided a tale inconsistent with the timeline of events as corroborated by independent witnesses and law enforcement, we cannot conclude beyond a reasonable doubt that the improper impeachment of the alibi witness’s testimony did not contribute to the jury’s verdict. Id.[1] This is especially true in light of the prosecutor’s closing argument, which focused on the inconsistency in the aunt’s testimony created by Sammiel’s statement. Therefore, we are compelled to reverse and remand for a new trial.

Reversed and remanded.

Gerber and Klingensmith, JJ., concur.

. We note that as it pertains to Sammiel, the effect of the admission of Sammiel’s statement did not have the same effect as it did not implicate Sammiel in any way.